UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

15-CV-6949 (MKB)(PK)

Ivan L. Cherry

Amended
**COMPLAINT**

Jury Trial Demanded

2016 MAR -3 PM 1:20

NAME OF PLAINTIFF(S)

v.

New York City Housing Authority
Bob Agbai, Fatima Turner
Marie Bazelais

NAME OF DEFENDANT(S)

This action is brought for discrimination in employment pursuant to (check only those that apply):

✓ _____ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) (race, color, gender, religion, national origin).
**NOTE:** *In order to bring a suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

_____ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634 (amended in 1984, 1990, and by the Age Discrimination in Employment Amendments of 1986, Pub. L. No. 92-592 , the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring a suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.*

_____ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117 (amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 and the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

-1-

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343.  Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law.

1.  Plaintiff resides at:

737 Miller Avenue    1R
Street Address

                                                          347-232-6503
Kings _____, n y ____, n207-7223  929-256-9085
County        State        Zip Code    Telephone Number

2.  Defendant(s) resides at, or its business is located at:

250 Broadway
Street Address

New York ____  New York ___  N Y ____,  10007
County         City          State          Zip Code

3.  The address at which I sought employment or was employed by the defendant(s) is:

578 Blake Avenue
Street Address

Kings ____,  Brooklyn ____  n y ____,  11216
County        City          State          Zip Code

4.   The discriminatory conduct of which I complain in this action includes
     *(check only those that apply).*

       \_\_\_\_   Failure to hire.

       ✔   Termination of my employment.

       \_\_\_\_   Failure to promote.

       \_\_\_\_   Failure to accommodate my disability.

       ✔   Unequal terms and conditions of my employment.

       ✔   Retaliation

       ✔   Other acts *(specify)*: Lack of Due Process

**NOTE:**   *Only those grounds raised in the charge filed with the Equal Employment
Opportunity Commission can be considered by the federal district court.*

5.   It is my best recollection that the alleged discriminatory acts occurred on:
     October 25, 2010 / September 26, 2014
     Date(s)

6.   I believe that the defendant(s) *(check one)*

       ✔   is still committing these acts against me.

       \_\_\_\_   is <u>not</u> still committing these acts against me.

7.   Defendant(s) discriminated against me based on my:
     *(check only those that apply and state the basis for discrimination, for example,
     what is your religion, if religious discrimination is alleged)*

    [✔]   race BLacK     [✔]   color BLacK

    [✔]   gender/sex MaLe     [ ]   religion _____

    [ ]   national origin _____

    [ ]   disability _____

    [✔]   age.  If age is checked, answer the following:

       I was born in 1957. At the time(s) defendant(s) discriminated against me,
               Year
       I was [✔ <u>more</u>  [ ] <u>less</u> than 40 years old.  *(check one).*

**NOTE:**  *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

8. ___ The facts of my case are as follows:

I was terminated due to false testimony given at my General Hearing in violation of the Fourteeth Amendment. I was bullied and retaliated against for complaints I made about my treatment. I was harassed with violence, threats and intimidation. Daily threats to fire me. Multiple racial and stereotype Rhetoric. Forced to do enormous amounts of work, and written up for not being able to do it all. Forced at no Pay.

*(Attach additional sheets as necessary)*

See Attached insert

**NOTE:**  *As additional support for your claim, you may attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.*

9.  It is my best recollection that I filed a charge with the New York State Division of Human Rights or the New York City Commission on Human Rights regarding defendant's alleged discriminatory conduct on: _____.

Date

10.  It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct on 7/25/13

Date

**Only litigants alleging age discrimination must answer Question #11.**

11.   Since filing my charge of age discrimination with the Equal Employment Opportunity

Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____✓_____      60 days or more have elapsed.

_____      less than 60 days have elapsed.

12.   The Equal Employment Opportunity Commission *(check one)*:

_____      has not issued a Right to Sue letter.

_____✓_____      has issued a Right to Sue letter, which I
received on _9 / 2 5 / 1 5_____.
/Date

**NOTE:**      Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity
Commission to this complaint.

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,
including injunctive orders, damages, pre-judgment interest, costs, and attorney's fees.

_Khoan Cheng_____
PLAINTIFF'S SIGNATURE

Dated: _2 /15/ 2016_____

_937 Miller Ave, 1R_
Address
_Brooklyn NY 11207_
_929-256-9085/ 347-313-3465_
Phone Number

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IVAN CHERRY,

        Plaintiff,

-against-

NEW YORK CITY HOUSING AUTHORITY,
Bob Agbai, Fatima Turner, Marie Bazelais,

        Defendants.

-------------------------------------------------------x

15 CV 6949 (MKB)(PK)

INSERT FOR COMPLAINT
JURY TRIAL DEMANDED

## STATEMENT OF ADDITIONAL FACTS

1. I am the Plaintiff in this case. I am suing my former employer for discrimination in employment.

2. The New York City Housing Authority (NYCHA), in violation of my rights, subjected me to unfair and unequal terms and conditions of employment, retaliated against me for complaining of discrimination, harassed me, and terminated my employment based on manufactured charges of misconduct.

3. I am a member of protected classes. I am Black, and I am male.

4. As described below, I was subjected to adverse employment actions because my co-workers and supervisors discriminated against me.

5. I was hired by NYCHA and began work on October 25, 2010, as a civil service employee, Secretary Level III, off the civil service list.

6. After working in several other jobs – a lifetime of a career working with the public -   I took the civil service exam and received computer and other training. I had temporary jobs at a number of City agencies, including NYC Transit, NYC Department of Education, NYC

Department of Buildings.

7. I was on the list five years waiting, and was hired due to a lawsuit (not involving me as a plaintiff) that required provisional employees to be fired and people on the civil service list to be hired.   When I started work at Unity Plaza Management office; I learned that I replaced a provisional secretary that worked in that office for 8 years.

8. This caused considerable hostility toward me in my workplace in the management office at Unity Plaza, a NYCHA public housing development.

9. Eight people worked in the office where I worked. I was the only male Secretary in that office. In the whole of NYCHA citywide, which is a very large agency,   I was the only Black male Secretary in my hiring pool.

10. I was treated like an intruder from the moment I started, and it was immediately made clear to me that a black male secretary was not welcome or wanted in the office.

11. I was placed in an office with no windows, and the air conditioner that was there for years, was removed shortly after I started working in that office at Ms. Diane Harvey's request. I thought it was removed and taken to another office, but 2 years later I saw it in the locked storage room next to my office.   I was not allowed to bring it back into my office. Every other office had air conditioning and windows that could have fans circulating fresh air.

12. It was very difficult for me to breathe. I have asthma and COPD – chronic obstructive pulmonary disease.

13. The other Secretary in the office, a Hispanic woman, was a manager's secretary. She had an office with air conditioning and windows.

14. I know that NYCHA could have installed air conditioning. In fact, they did install it in my office the day I was suspended, without a hearing.   I saw it being installed in the wall as I was packing to leave the office.

15. I believe that this was done to drive me out because they did not want me, a black male

2

secretary, working with them.

16. The people in particular who harassed me included my manager, Marie Bazelais, and a housing assistant, Fatima Turner, along with former housing assistant Diane Harvey, and with the assistance of housing assistant Bob Agbai, and NYCHA Management.

17. Some of the examples of the hostile work environment are below.

18. From day one, before I was even hired, as I was interviewing for the position, it was made clear to me that I was not really welcome in the position.

19. After I was hired, the defendants repeatedly harassed me and tried to provoke me because of my race and gender.

20. On numerous occasions, Ms. Diane Harvey screamed at me repeatedly and tried to provoke arguments, which I never engaged in.   She would ignore my phone calls, would interrupt me when I was interacting with tenants, and would complain and yell about me.

21. For example, very early on in my employment, Ms. Harvey heard a tenant come in to the office to deliver papers just a few minutes before lunch time.   I explained to the tenant that Ms. Harvey was leaving for lunch and she could leave the papers.   Ms. Harvey then came out and started screaming and cursing at me.   She hovered over me in an intimidating manner as she cursed at me, and as I tried to turn away she would move and continue to hover over me screaming. When I pointed to the manager, I accidentally brushed her arm and she started screaming and told the assistant manager that I hit her. I was then written up, and, even though there were witnesses who could have proved that I did not hit her, the complaint stated that I hit her and no one came to my defense even though they knew I didn't hit her. The complaint against me claiming that I was creating a hostile environment, and not mentioning any of Ms. Harvey's inappropriate and provoking behavior.   Ms. Harvey also went to the police and filed a false report, though I was never contacted about this by the police. Immediately following this incident, I was also given a performance review that claimed that I was causing friction in the office, with no mention

3

of the other employees acts to intimidate me.   The police never pursued this—perhaps because they recognized it was a false report—yet it somehow ended up in my file without me being informed as is normally required.

22. In another similar incident, a tenant came to the office and Ms. Harvey would not answer her phone, so I walked the tenant back to her office where Ms. Harvey and the tenant spoke.   Ms. Harvey later came out and screamed at me for allowing the tenant to go back to her office and wrote me up for this—yet another incident of fabricated claims against me.

23. Ms. Harvey also poisoned other employees against me.   For example, she encouraged Ms. Turner to mistreat me as well.   Ms. Harvey encouraged Ms. Turner to undermine me with the tenants.   Ms. Harvey and Ms. Turner would also provoke hostility against me on the part of the tenants by claiming that I was not passing on their messages, and, generally, that I was not doing my job.

24. Ms. Bazelais told me on several occasions that I was not suited for the job because "this is a woman's job."

25. Ms. Bazelais, when I told her I had the secretary job because I am physically disabled, said I should quit and go back on disability.

26. Ms. Bazelais is Haitian. I heard her make comments about American Black people being lazy and not wanting to work. She also said that me being a man, I could not do a woman's job as well as a woman.

27. She was the manager of this NYCHA development.

28. Ms. Bazelais refused to listen to my complaints.   For example, when I told her that the air conditioner had been removed and asked that it be replaced, she completely ignored my request.   When I told her that I had filed a work order ticket to have someone fix the wall of my office and put in an air conditioner, she had the request removed from the system, determined to make my stay there unbearable in an effort to force me out.

4

29. She would also give me excessive assignments, requiring me to work over time, but then would refuse to authorize the overtime pay, claiming that I was not doing my work when I was actually working overtime.   I was a diligent worker, and, knowing this, she intentionally assigned me more work than I could do so that she could then claim that I was not adequately performing my duties.   I had never faced these complaints before and had always tested and performed well and was praised by my previous employers. The way that my performance was portrayed by the individual defendants and NYCHA is completely inapposite to all of my prior experience.

30. The two housing assistants in the office felt they had license to behave in the same way, after they heard the way Ms. Bazelais addressed me.   She set the tone of bullying, harassment and humiliation against me by other NYCHA staff.

31. For example, when tenants would ask for a woman to help them in the office instead of me, Ms. Turner or Ms. Bazelais would speak over me and take care of the tenants, allowing the perception that I was not capable of doing my job.

32. I have years of experience working with people and this was extremely offensive.

33. These coworkers tried to bully and harass me and provoke violence from me, but I was never violent. This was based on them trying to make me look like a scary young Black male, but I am 58 years old and a peaceful person.

34. Mr. Agbai is also a Black person from another country. He had stereotypes against American Blacks, including me.   He, along with the other defendants, tried to portray me as angry and irrational, creating a picture of me as an angry violent black man in order to try to drive me out or get me fired.   They manufactured a case against me by portraying me as someone I am not and lying in order to get rid of me.   NYCHA allowed this to happen.

35. Mr. Agbai and Ms. Bazelais uses stereotypical racial rhetoric toward me, calling me "belligerent," "irate," "out of control" and "crazy." None of these things describe me. I know

5

how to conduct myself in my workplace.

36. Mr. Agbai was witness to these acts of harassment, but he never spoke out and helped to facilitate the misbehavior.   For example, despite the fact that, unlike my co-workers, I never cursed or used harassing language, Mr. Agbai would join in calling me names and trying to make me out to appear as an "angry Black man."   He also testified against me, and lied to support the manufactured case against me.

37. I am an African American Male. I believe that I have been discriminated against based on my race, sex, national origin, color, and retaliated against by my employer, the NYC Housing Authority (hereinafter referred to as "Respondent").

38. I was employed as a secretary by Respondent from 2010 to 2014. I performed my job well. I believe that I unjustly received negative performance evaluations and misconduct memos. I even had a false police report placed in my personnel folder due to false charges made by Diane Harvey. The police never investigated the charge, and, I was never given a chance to defend myself against the false charge. The police report was put into my personnel folder without my knowledge. I did not learn about the police report until a year later. No policemen or NYCHA management ever spoke to me about the false charge by Ms Diane Harvey.

39. I was subjected to harassment and name calling and unfair treatment by female staff members, including Diane Harvey, Marie Bazelais, and Fatima Turner.   Since I was a Black Man, no action by fellow employees or NYCHA's management was ever taken to address my complaints.   Instead, these employees attempted to make me out as an angry black man.   They tried to fabricate a picture of me as angry and violent and ready to fly off the handle at any moment when, in reality, I was remaining calm and trying to do my job despite the incredibly hostile work place that was being created.

40. I was also repeatedly retaliated against.   In addition to the incident referenced above

6

where I was written up after Ms. Harvey was intimidating me, other false reports and complaints were also filed against me. For example, I was once written up for going to the copy room to fax something as required by my job because the other employees, in particular Ms. Harvey, refused to cover my desk for me while I went to the copy room. As soon as I got up, she called to report me for abandoning my desk and I was written up for inappropriately abandoning my post.

41. In another incident, only days after I filed an EEOC complaint, Mr. Bazelais complained about me and fabricated an incident alleging that I inappropriately refused to accept a check when in fact NYCHA policy does not allow me to accept a money order unless it was given to me by the head of household, which it was not.

42. When I tried to explain this, Ms. Bazelaid stood above me and yelled, preventing me from leaving for over an hour after I had finish work, in an effort to provoke a fight from me.

43. I was consistently subjected to disparate treatment in comparison to female secretaries, in addition to bullying and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended, and all applicable state and local statutes, the New York State Human Rights Law, and the New York City Administrative Code Sections 8-107 et. seq. by NYCHA and the individual defendants.

44. I was terminated for workplace violence due to false charges by Marie Bazelais and Fatima Turner in retaliation for my complaints of harassment and bullying. Due to my sex and skin color; the charges were never questioned or investigated by police, as required by NYCHA policy. Despite the inconsistent stories and testimony, no one questioned the story fabricated by the defendants.

45. The trial officer at my hearing never questioned the false testimony of the three witnesses that accused me of workplace violence, and twisted himself into a pretzel to excuse away obvious contradictory testimony by those witnesses. The only testimony that made sense

7

was by me, and the trial officer considered my testimony not credible only because of my sex and skin color.   The trial officer bought the story of the defendants without question and, from the start, it was clear that he was only interested in believe the fabricated story wherein I was an angry violent black man, and never even attempted to hear my side of the story.

46.  This hysterical lynching was upheld by the NYC Civil Service Commission even after conceding that I had an incompetent attorney furnished by my Union.   Numerous complaints by me to my Union Representative was ignored because I was a Black Man accusing Black Women of harassment and bullying.   They refused to address the inconsistent testimony and instead just told me that the officer's decision could not be reviewed.

47. The way I was treated by Marie Bazelais and Fatima Turner and Bob Agbai was with the blessing and assistance from the New York City Housing Authority and the NYC Civil Service Commission. I believe this racist treatment was allowed and promoted by NYCHA and NYC due to retaliation for a prior lawsuit I filed against NYC, and I worked in a female dominated profession.

48.  I never said a word to Ms. Fatima Turner the day of July 9, 2013.   She tried numerous times to provoke some type of argument from me.   Since she could not get a response from me; she made up this story, and convinced Bob Agbai to lie for her.   She was out of control and yelling at Mr Agbai.   When they heard me calling the Borough Office; they made up a story to protect Ms Turner and make me look guilty of violence against women.

49. Why didn't Ms. Turner or Mr. Agbai call the police, the Borough Office, The Office of Safety and Security, or walk less than a block away to the police station?   It never happened, that's why it doesn't make sense.



50. I was bullied, and retaliated against when I complained about my treatment.

51. For nearly 4 years I was the object of abuse, bullying and harassment.

52. And, out of all the men that worked for NYCHA; none ever accused me of violence, or name calling, or cursing.   Violence against women is a pattern that builds.   I have no history of violence against anyone.   I would not suddenly turn violent at the age of 57 years old.

53. The charges made against me were manufactured only after numerous attempts to provoke an argument, or a violent response from me.   When that didn't happen, they were forced to make something up in order to get rid of me.

54. The only reason they were believed over me was because I am a Black Man, and women were charging me with the violence.

55. Regardless of how blatantly obvious the motivation, or outrageous and unbelievable the charges, they were believed, and never questioned, or even investigated because I am a Black Man!   No Questions Asked!   I was the victim of mob rule, and Hysterical Lynching, where the truth did not matter.

56. This was a hostile work environment for me.

57. I was harassed, bullied, humiliated, and portrayed as a scary   Black Man by the use of racist code words reserved for Black Men and injected into every reference about me to make me look scary.

58. Some of the words used about me by the other NYCHA employees were "belligerent,", "out of control," "irate," "aggressive," "crazy," "really gone," "flailing arms," "became confrontational," "he's yelling", "being offensive," "barges his way into office", "that ain't right," and cursing and yelling "I will punch you in the face", "erratic behavior," "trying to be bold," "create a ruckus" and "he's going off."

59. I am a 58 year old Black Gay Man. I have never threatened to hit another person in my adult life. I have no criminal record of assault or menacing. During my entire work history,

I was never written up or charged with any type of violence or even rude behavior. As an employee of NYCHA I worked hard, conducted myself with respect for my co-workers, and management. I never assaulted my co-workers. These were convenient lies made up to fire me.

60. While I was still working at Unity Plaza, I began to research what constitutes harassment and bullying. I found that the definitions fit exactly what was happening to me.

61. I complained to the Borough Director of NYCHA for Brooklyn, Denise Brockington, about the behavior of Ms. Turner.

62. Ms. Brockington ignored my complaints and made me feel badly and retaliated against me for my complaints.

63. For example, a few weeks before the final incident, I wrote an email complaining to Ms. Brockington that Ms. Turner's mistreatment of me was affecting others.   In particular, an individual who came to the office to deliver rent checks was kept waiting for over an hour because Ms. Turner refused to answer my calls.   When I let Ms. Brockington know about this incident, she responded that she did not want to be bothered and was upset with me for making the complaint.

64. I contacted my union with complaints about bullying by these women based on my being Black and male, but they would not help or protect me either. I believe this was because I am male and they did not credit my complaints as real because I   was a man alleging that I was bullied by a woman, and not a woman complaining about bullying by a man.

65. One day I was directed to go to a training class where Ms. Turner would be. I asked not to go to this class because she was the person who accused me of workplace violence.

66. I was told to attend, and I did.

67. Ms. Turner saw me there, went and spoke with the instructor, and then the instructor told me to leave without speaking to me.   This happened before any hearing was held. That was humiliating, and done strictly for entertainment like most of the dehumanizing

10

treatment I was subjected to.

68. I complained to the union about this. They did not take any action on my behalf.   The union representative actually said MAYBE I was thrown out of the class because I disrupted the class by coming in late.   When I told the union representative that the class instructor allowed me to enter the classroom, and told me to be seated; she said MAYBE Ms. Turner asked that you be removed for coming in late.   Somehow, she became the NYCHA instructor's superior.   This is the type of illogical and blatant racism and sexism I faced on a daily basis at NYCHA.

69. Anything I said about being a victim of this discriminatory treatment was turned around on me, and I was punished for complaining.   I was repeatedly written up for trivial incidents, which were often twisted or fabricated, often coinciding with complaints I had made about the defendants mistreatment.   I was made to look like a Scary Black Man by NYCHA. Every word and action used to described me was tainted by stereotypical and racist manufactured rhetoric.

70.  I was continually harassed and bullied by female employees and tenants that felt I should not be doing a women's job. They would allow tenants to refuse to speak to me because I was a male, preventing me from doing my job.

71. I also had an ongoing law suit against a woman that hit me with a NYC Transit truck. Although my Leave of Absence was suppose to be private;   I was accused of "trying to take that ladies money" by an employee I had never seen before.

72. Shortly after that I was harassed, and cursed at, and threatened by a female employee that was trying to provoke fights with me.

73. My complaints about the harassment was ignored by management and union personnel.

74. When that Ms. Harvey accused me of hitting her; I was written up for attacking her even though the assistant manager walked in on her assaulting me.

75. The assault on me was not only completely ignored by management, but I was written up alleging that I had somehow provoked the incident and created friction in the workplace. Ms. Harvey filed a police complaint that the police considered baseless.   I was never contacted by police.   I was never arrested.   But, more than a year later, I found that closed police report in my employee folder without my knowledge.   Adding this report to my folder was just another step in their plan to create an image of me as a scary violent black man in an effort to manufacture a case against me and get me fired.

76. The harassment and unfair treatment and hostility continued until I was again accused of sexual harassment, assault on the female manager, and threatening to punch a co-worker in the face—all completely erroneous allegations. The same people I filed EEOC complaints about for harassing me, and bullying me, and threatening me fabricated these allegations in retaliation against me for trying to protect myself against their campaign of harassment.

77. At unity plaza I had to work in an office with no windows, and no air conditioner.   I also had to work in a copy room, copying folders for hours a day without windows or working air conditioner.   I was not paid for many hours of overtime I worked.

78. I was forced to do an unfair amount of work order tickets, calls, annual reviews, mailings , Folder Copies, Create tenant folders,   Straighten out folders.   Prepare folders for court. Check folders for correct documents before coping.   Do timekeeping.   Track down employees that needed to fill out forms.   Track down tenants that were not home for scheduled repairs.   Call maintenance about tenant repairs.   Call and request repairs or to retrieve items from elevator shafts.   All while doing my regular receptionist duties of answering phones and directing people to the right person to help them.

79. I was required to sign in tenants, check for back rent, check for correct phone number, ask tenants about repair complaints and research the work order tickets, give tenant rent

12

receipts, check their annual Review Booklets, then, call the person they came to see. By that time; the tenant would be very upset because they never had to do these things before with a receptionist at the window of Unity Plaza.

80. I was also written up for HIDING work that I was order not to leave on my desk.   I was being harassed and demeaned and threatened by co-workers that was ignored by the manager and union officials.

81. I believe that this was done in an effort to portray me as incapable of doing my job.   I am an incredibly hard worker and I worked diligently in this job, so they had to create so much work that I could not possibly complete it in order for them to create a basis to complain about me

82. Retaliation: As soon as I made a EEOC complaints about the workplace bullying and harassment;   I was harassed, incidents were manufactured, or twisted to make it my fault.

83. Racist rhetoric was inserted into to everything I did or said. When I was fired for workplace violence, the charges were brought by the same people I made the complaints about.

84. At the marcus garvey office, Ms. Chu, who was the manager, would tell me to do something and right away tell me to stop doing it as soon as I would start.   She had heard about what happened at Unity Plaza and was treating me the same way or even worse.

85. She lied to my co-worker and told her I closed her office door after an exterminator sprayed her office with bug spray.   She would also humiliate me by holding town-hall type meetings to discuss my personal leave issues and medical issues with the office staff.

13

86. Ms.Chu told me to inform her of any emergency situations that happened at the development.   When an emergency situation happened, and I did inform her by intercom; she claims I should have just informed the Superintendent Mr. Ortiz.   When I would inform Mr. Ortiz about a problem, I was accused of not letting her know about the problem.   I was charged with being absent without leave for being out sick, and in the emergency room.   I called and spoke to the superintendant and asked to speak to the manager Ms Chu.   He could not reach her.   I was then not paid sick leave and charged with being absent without leave and having a diciplinary memo written and put in my work folder.

87. Fatima Turner and Bob Agbai lied in order to frame me for violence against women.   Ms. Bazelais lied about me attacking her, cursing at her, menacing her, Mr. Agbai, and Ms. Turner.   Together, they lied at my NYCHA hearing.   NYCHA management allowed this behavior and assisted in covering up real facts and prosecuting me with false charges. None of this would have happened to a White Male, White Woman, or a foreign man or woman.

88. There is numerous incidents of inconsistent testimony in the NYCHA hearing on behalf of the defendants.   For example, the very incident for which they fired me, was described inconsistently by Mr. Agbai, Ms. Turner, and Ms. Brockington.   For example, the incident began, as described above, with a request to keep the door open so we could share the air conditioner.   However, when Mr. Agbai and Ms. Turner testified about this, their testimony was rife with inconsistency concerning whether the door was open and my requests to share the air conditioner.   Ms. Turner testified that I was "belligerent" and "barged into the office" and that I was cursing and opened the door without asking. However, Mr. Agbai stated in an email concerning the incident that he had urged Ms. Turner to calm down and told me that he did not care about leaving the door open.   He

1 4

also testified that I came into his office while he was in there alone, while Ms. Turner testified that she was in Mr. Agbai's office with him.

89. These facts constitute violations of the laws of New York City Housing Authority, District Council 37, New York City, New York State, and the United States Title VII of the Civil Rights Act of 1964 and a hearing was brought against me.

90. At the hearing held by NYCHA after I received notice of termination, NYCHA employees lied under oath.

91. On page 39 of the Hearing Transcript, Fatima Turner testified that she was in room one and asked Mr. Agbai if she could close the office door. Mr. Agbai testified on page 85 that he closed the door that morning, and if Ms. Turner asked to open the door; why did Mr. Agbai close it right back?

92. Ms. Turner testified that she and Mr. Bob Agbai were in his office together-in the meantime Mr. Agbai said he closed the door because he had no idea why it was open. He also testified that after he closed the door and went back in his office he was alone, and I came into the office and opened the door and, (instead of going to my own office) came back into his office to yell at him. Then he testified that Ms. Turner came out of her office, and asked him what is going on. Ms. Turner testified that she was already in Mr. Bob's office, and I came in yelling and almost knocked both of them down.

93. This is completely opposite testimony from two witnesses that Mr. Gold deemed credible witnesses. Mr. Trafficante did not leave the office until 9AM. Mr. Bob Agbai claims this all happened after 9:15 AM. And, my complaint email was sent to Ms. Brockington at 9:30 AM So, if Ms. turner found the door opened, and she closed it with Mr. Agbai's permission; again the question is, why did Mr. Agbai close it back within a few minutes and claim he had no idea why it was open?

94. Their testimony does not make sense or could not have physically happened the way they testified it happened. Ms. Turner closed the office number one door after Mr.

1 5

Traficante left at nine am.   And, lied stating she closed the door because files were in the room that had to be protected.   Yet, Ms. Turner and Ms. Brockington testified that that the door would be open in the summer to cool my office.

95. Another incident that occurred during the trial was that Ms. Brockington, lied on the stand about several different things.   First, she lied about there being an air conditioner in my office in order to make me look like I was exaggerating or not telling the truth.   Then, she testified about the incident, and her testimony was inconsistent.   She omitted from the testimony that the reason she was called to the office that day was because I had called her to let her know.   She then lied about speaking with me, as she never spoke with me about the incident, and, instead, she went straight to Ms. Turner and Mr. Agbai and spoke with them, helping them to develop their story against me.

96. This was done to hurt me for retaliation for complaints I made to Ms. Bazelais, Mr. Traficante, Ms. Brockington, and the EEOC regarding the harassment and bullying by Ms. Turner towards me.

97. The only testimony that makes sense is mine and the only story that fits the timeline of the events testified to is mine.   At 9:00 AM on July 9th, 2014, Mr. Traficante came to my office to tell me he was going to a Borough Meeting.   Around 9:15 AM, I felt my office getting really hot. I looked out my door and saw the door to office number one was closed. The air conditioner in that office was my only way the hallway and my office would stay cool.

98. So, walked over to Mr. Agbai's office and asked him who closed the door, and could I open the door back because my office was getting really hot?   He said "sure, go ahead", so I entered his office and went through the connecting door in his office and opened the door back. (which had been open every day prior to that day).

99. As I walked into Mr. Agbai's office; Ms. Turner yelled from her office that she closed the door because Bob needs the air conditioning because his air conditioner isn't working

16

that good. As she was yelling, she was walking over to Mr. Agbai's office yelling to Mr. Agbai that he knows he needs that door closed. And, he knows his air conditioner is not working that well.

100.     I heard the door close again, so I walked backed to Mr. Agbai's door and asked him if I could open the door back? That way, all of us would stay cool. Still sitting at his desk and Ms. Turner standing at his desk; she yelled again at him, No! You know you need that door closed, as I walked by her. He told her to calm down.

101.     I walked to the door and opened it, and went through the door to my desk.

102.     I then called the Borough Office to and asked to speak to Ms. Brockington. When the secretary said she was not there; I asked her to send somebody to Unity Plaza because someone was trying to start trouble with me at my office. The secretary asked who's trying to start trouble with you? Is it a man, or a woman? I said, it's a woman, but, she acts like a man the way she keeps trying to start fights with me. The secretary said she would contact Ms. Brockington right away. Ms. Turner became silent and walked back to her office.

103.     I then walked back to Mr. Agbai's office door and said, and basically asked him why do people keep trying to start fights with other people? They're obviously not mad. If they were, they would yell at me or punch me in my face or something.(basically saying, I knew she was trying to start fights with me intentionally, and I wasn't going to fall for it. I then walked back to my office, and I saw Ms. Turner walked back into Mr. Agbai's office and asked him "what did he say?" I believe that Ms. Turner and Ms. Brockington convinced Mr. Agbai to lie and support their story, which he eventually did.

104.     I then called the Borough Office back and asked the secretary if she reached Ms. Brockington, because that person is still at it. She asked if there was any physical violence by her? I answered no. She never came near me. She said she left Ms. Brockington a message and would call her again. So, I hung up and waited for Ms.

17

Brockington's call.   Ms. Turner obviously realized that she lost control and went too far.

She also was figuring out a story to tell because I heard her say to Mr. Bob "At least now I'll

be able to buy milk for my children."

105.      I didn't realize what was that meant until Ms. Brockington came to the office and

said she was going to suspend me for workplace violence, because I threatened to punch

Ms. Turner in the face.

106.      I had no idea Mr. Agbai would lie for her until 6 months later.   False testimony by

witnesses at a trial or trial-like hearing is a violation of due process, and the case has to be

reversed in that type of case.

107.      On page 64 and 65 of the hearing transcript, Ms. Turner testified that there was an

air conditioner standing on a table in my office, so did Ms. Brockington.   Witnesses called

from NYCHA will prove that is a complete lie.

108.      Also Mr. Gold, the hearing officer, testified in his decision to things that were

never raised at the hearing.   He said that I was able to bring an air conditioner into my office

which had no window to vent the exhaust.   And, without any testimony stating I could have

done that without permission and without the air conditioner's exhaust hose being installed in

the wall.   Which he testified was done the day I was suspended.   The air conditioner is a

relevant fact of the case, and the lies about it is a violation of due process law.

109.      Ms. Turner testified on page 71 of the hearing transcript that she wrote an email to

Ms. Brockington on the day the incident with the door happened.   The emails from Ms.

Turner and Mr. Agbai were not sent until the next afternoon.   That was another one of a

series of lies told in my case that were blatant and obvious, yet overlooked by the three

attorneys at my hearing.   Again, these people were considered credible witnesses,   and

my testimony was the one that made actual sense.   This was an Arbitrary and Capricious

act by the Trial Officer.

110.      In sum, I suffered discriminatory treatment and bullying based on my race and

18

gender. When I complained, I was retaliated against. I also suffered retaliation based on my having been hired to replace a woman in what the Defendants said was "a woman's job."

111.    In addition to the discrimination, the Defendants violated New York Civil Services Law, New York Housing Law, and committed perjury.

112.    These defendants casually destroyed my life. The damage done to me was severe.

113.    Because of the charges of violence and being fired from a Civil Service position that I had worked hard to earn, I have not been able to find other employment and I have suffered great emotional harm.

*Kuan Cheng 2/15/2016*

### Claims Against Defendants

1. FIRST CLAIM:   Employment discrimination under Title VII of the Civil Rights Act of 1964, as amended, and all applicable state and local statutes against NYCHA.

2. SECOND CLAIM:   Employment discrimination in violation of New York State Human Rights Law, Executive Law Sections 296 et. seq. against NYCHA and the individual defendants.

3. THIRD CLAIM:   Employment discrimination in violation of New York City Administrative Code Sections 8-107 et. seq. against NYCHA and the individual defendants.

19

Ivan Cherry; pendent state law claims vs. employer and individuals for discrimination, and vs. supervisors for infliction of emotional distress:

___ CLAIM: Employment discrimination in violation of New York State Human Rights Law, Executive Law Sections 296 et seq. (against NYCHA and the individual defendants)

N.Y. Executive Law § 296(1)(a) makes it an unlawful discriminatory practice "For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

N.Y. Executive Law Section 296(6) makes it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the Human Rights Law], or attempt to do so."

By their actions as described above, NYCHA and the individual defendants have committed unlawful discriminatory practices by discharging plaintiff from employment and discriminating against him in the terms, conditions and privileges of employment because of his race and sex.

By their actions as described above, the individual defendants have aided, abetted, compelled and/or coerced the discriminatory acts forbidden by the State Human Rights Law.


___ CLAIM: Employment discrimination in violation of New York City Administrative Code Sections 8-107 et seq. (against NYCHA and the individual defendants)

New York City Administrative Code makes it an unlawful discriminatory practice "For an employer **or an employee or agent thereof**, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

By their actions as described above, NYCHA and the individual defendants have committed unlawful discriminatory practices by discharging plaintiff from employment and discriminating against him in the terms, conditions and privileges of employment because of his race and sex.

20

____ CLAIM: Intentional infliction of emotional distress under New York law
(against the individual defendants)

The individual defendants caused the Plaintiff severe emotional distress by
engaging in the extreme and outrageous conduct described above.

The individual defendants intended to cause, or had a reckless disregard of a
substantial probability of causing, severe emotional distress to the Plaintiff.

The individual defendants' conduct was the cause of Plaintiff's severe emotional
distress.

The individual defendants' conduct, including ____, caused the Plaintiff to fear for
his own physical safety.

[Howell v. New York Post Co., 612 N.E.2d 699, 701 (N.Y. 1993) wherein the Court found that,
"[l]iability [for intentional infliction of emotional distress] has been found only where the
conduct has been so outrageous in character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized
community." Id., 612 N.E.2d at 702-03.

The circumstances under which recovery may be had for
purely emotional harm are extremely limited and, thus, a
cause of action seeking such recovery must generally be
premised upon a breach of a duty owed directly to the
plaintiff which either endangered the plaintiff's physical
safety or caused the plaintiff fear for his or her own
physical safety.]