UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IVAN L. CHERRY,

               Plaintiff,

         v.

NEW YORK CITY HOUSING AUTHORITY and
MARIE BAZELAIS,

               Defendants.

**MEMORANDUM & ORDER**
15-CV-6949 (MKB)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

| | | |
|---|---|---|
| I. | Background | 4 |
| a. | Employment at Unity Plaza | 5 |
| i. | Gender discrimination | 6 |
| ii. | Sexual orientation discrimination | 9 |
| iii. | Disability discrimination | 10 |
| b. | Plaintiff's suspension | 11 |
| c. | EEOC Charges | 13 |
| i. | July 26, 2011 EEOC Charge | 13 |
| ii. | April 2013 EEOC Charge | 14 |
| d. | Employment at Garvey Plaza | 16 |
| e. | Plaintiff's trial pursuant to Civil Service Law Section 75 | 17 |
| II. | Discussion | 20 |
| a. | Standard of review | 20 |
| b. | Title VII and NYSHRL gender discrimination claims and NYSHRL disability discrimination claim | 22 |
| i. | Title VII and NYSHRL gender discrimination claims | 24 |
| 1. | Prima facie case | 24 |
| A. | Adverse employment actions | 25 |
| (1) | Non-secretarial work and disproportionate workload | 25 |
| (2) | Failure to pay overtime | 29 |
| (3) | Counseling and instructional memoranda | 31 |

   B. Inference of discrimination ................................................................34

  2. Legitimate, nondiscriminatory reason................................................40

  3. Pretext ...............................................................................................42

 ii. NYSHRL disability discrimination claim ............................................43

  1. Prima facie case...................................................................................46

   A. Defendants' knowledge of Plaintiff's disability .............................46

   B. Adverse actions .............................................................................47

    (1) Access to kitchen sink and drying rack...................................47

    (2) Denial of requested leave of absence .....................................49

  2. Legitimate, nondiscriminatory reason................................................50

  3. Pretext ...............................................................................................51

 c. Hostile work environment claims...........................................................51

 i. Title VII and NYSHRL hostile work environment claims based on gender discrimination ..................................................................................52

 ii. NYSHRL hostile work environment claim based on sexual orientation discrimination ..................................................................................59

 iii. NYSHRL hostile work environment based on disability discrimination ................62

  1. Unity Plaza ........................................................................................62

  2. Garvey Plaza.......................................................................................64

 d. Title VII, NYSHRL, and NYCHRL retaliation claims ...............................66

 e. NYCHRL gender and disability discrimination claims and gender, sexual orientation, and disability-based hostile work environment claims................................71

 i. Claims where the Court denies Defendants' motion under Title VII and NYSHRL 71

 ii. Claims where the Court grants Defendants' motion under Title VII and NYSHRL.71

  1. Assignment of non-secretarial work ....................................................74

  2. July 29, 2011 counseling memorandum................................................74

   A. Adverse action...............................................................................75

   B. Inference of discrimination.............................................................75

III. Conclusion .......................................................................................77

Plaintiff Ivan L. Cherry, proceeding *pro se*, commenced the above-captioned action on December 3, 2015, and filed an Amended Complaint on March 3, 2016, against Defendants New York City Housing Authority ("NYCHA"), Bob Agbai, Fatima Turner and Marie Bazelais. (Compl., Docket Entry No. 1; Am. Compl., Docket Entry No. 14.)  In the Amended Complaint,

Plaintiff asserts claims of discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 42 U.S.C. § 12101 *et seq.* (the "ADEA"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* (the "NYCHRL"), and also alleges that he was deprived of his Fourteenth Amendment due process rights in violation of 42 U.S.C. § 1983.[1]  (Am. Compl. 3.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to Plaintiff's claims of (1) gender-based discrimination and hostile work environment in violation of Title VII, the NYSHRL and the NYCHRL, (2) disability-based discrimination and hostile work environment in violation of the NYSHRL and the NYCHRL, (3) sexual orientation-based discrimination and hostile work environment in violation of the NYSHRL and NYCHRL, and (4) retaliation claims under Title VII, the NYSHRL and the NYCHRL.  (Defs.' Mot. Summ. J. ("Defs.' Mot."), Docket Entry No. 86; Defs.' Mem. in Supp.

---

[1]  By Memorandum and Order dated September 29, 2017 (the "September 2017 Decision"), the Court granted in part and denied in part Defendants' motion to dismiss the initial Complaint.  The Court dismissed all claims against Turner and Agbai, the ADEA and due process claims against all Defendants, and the Title VII claim against Bazelais.  (Sept. 2017 Decision, Docket Entry No. 33.)  The Court denied the motion to dismiss the Title VII, NYSHRL, and NYCHRL gender discrimination, hostile work environment and retaliation claims against NYCHA, and the NYSHRL and NYCHRL gender discrimination claims against Bazelais.  (*Id.*)  The Court also declined to consider Plaintiff's newly raised Title VII sexual orientation and ADA claims because Plaintiff failed to exhaust his administrative remedies as to those claims.  (*Id.* at 40 n.29.)  The Court allowed Plaintiff's sexual orientation and disability claims to proceed and directed Plaintiff to file an affidavit in support of those claims.  (*Id.*)  On October 27, 2017, Plaintiff filed an affidavit specifying the basis for his sexual orientation and disability discrimination claims against NYCHA and Bazelais under the NYSHRL and the NYCHRL and the Court allowed those claims to proceed.  (Sept. 2017 Decision 60; Pl.'s Aff. in Supp. of Sexual Orientation & Disability Discrimination Claims ("Pl.'s Aff.") ¶ 7, Docket Entry No. 36.)

Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 87.)  Plaintiff opposes Defendants' motion. (Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket No. 95.)

For the reasons discussed below, the Court denies in part and grants in part Defendants' motion for summary judgment.  The Court denies Defendants' motion as to: (1) Plaintiff's gender-based discrimination claim under Title VII, the NYSHRL, and the NYCHRL with regard to Defendants' failure to pay overtime and assignment of a disproportionately heavy workload; (2) Plaintiff's disability discrimination claims in violation of the NYSHRL and the NYCHRL; (3) Plaintiff's gender-based hostile work environment claims in violation of Title VII, the NYSHRL, and the NYCHRL; (4) Plaintiff's sexual orientation-based hostile work environment claims in violation of the NYSHRL and the NYCHRL; (5) Plaintiff's disability-based hostile work environment claims in violation of the NYSHRL and the NYCHRL; and (6) Plaintiff's gender-based discrimination claim under the NYCHRL with regard to the counseling memorandum dated July 29, 2011.  The Court grants Defendants' motion as to: (1) Plaintiff's gender discrimination claim under the Title VII and the NYSHRL based on the assignment of non-secretarial work, the issuance of counseling and instructional memoranda, and his termination; (2) Plaintiff's gender discrimination claim under the NYCHRL based on the assignment of non-secretarial work and his termination; and (3) Plaintiff's retaliation claims under Title VII, the NYSHRL and the NYCHRL.

## I.  Background

The following facts are undisputed unless otherwise noted.

Plaintiff identifies as a "gay, HIV [p]ositive man."  (Pl.'s Stmt. of Undisputed Facts pursuant to Loc. Rule 56.1 ("Pl.'s 56.1") 1, Docket Entry No. 95-2.)  On October 25, 2010, Plaintiff began working for NYCHA as a Level 3A Secretary at Fiorentino Unity Plaza ("Unity

Plaza"), (Defs.' Stmt of Undisputed Facts pursuant to Loc. Rule 56.1 ("Defs.' 56.1") ¶ 3, Docket

Entry No. 88; Human Resources R. Card, annexed to Decl. of Jane Lippman in Supp. of Defs.'

Mot. ("Lippman Decl.") as Ex. 5, Docket Entry No. 90-1), and worked at Unity Plaza until

August 14, 2013, when he was transferred to Garvey Prospect Plaza ("Garvey Plaza").  (Defs.'

56.1 ¶¶ 14, 110.)  Plaintiff worked at Garvey Plaza until April 1, 2014, when Defendants

transferred him to Louis Armstrong, another NYCHA site, where he worked until his termination

effective September 26, 2014.  (*Id.* ¶¶ 31, 126.)  Plaintiff contends that beginning in or about

January of 2012 and throughout his experience at Unity Plaza, he endured gender, sexual

orientation, and disability discrimination, and retaliation, and was also subject to disability

discrimination at Garvey Plaza.  (Am. Compl. 3; Pl.'s Aff. ¶¶ 6, 46–55.)

   a.   **Employment at Unity Plaza**

   Plaintiff worked for NYCHA as a Level 3A Secretary at the Unity Plaza location from

October 25, 2010, through September 26, 2014.  (Defs.' 56.1 ¶ 3.)  The Civil Service Job

Specification Sheet provides that the responsibilities of the Level 3A Secretary include both the

responsibilities of the Level 2 Secretary — word processing, scheduling appointments and other

general office work — and the following "more difficult duties": (1) "[s]erv[ing] as secretary to

a high level employee relieving principal of routine duties and perform[ing] general office work,

including scheduling appointments"; (2) "[u]tilizing automated office systems" and

"perform[ing] complex word processing assignments"; (3) "[s]upervis[ing] and train[ing]

subordinate staff"; (4) "[p]lan[ning], assign[ing], and review[ing] the work of subordinates"; and

(5) "[s]erv[ing] as principal assistant to a supervisor of a larger section, or unit engaged in

secretarial, typing, word processing and office activities." (Civil Service Job Specification Sheet 93–95, annexed to Lippman Decl. as Ex. 6, Docket Entry No. 90-1.)[2]

When Plaintiff started working at Unity Plaza in 2010, his supervisor was Linda Mimes. (Dep. of Ivan Cherry ("Pl.'s Dep.") 27:9–14, annexed to Lippman Decl. as Ex. 7, Docket Entry No. 90-1.) After Mimes retired on January 3, 2012, Marie Bazelais was promoted to Housing Manager and transferred to Unity Plaza where she replaced Mimes as Plaintiff's supervisor. (Defs.' 56.1 ¶ 2; Pl.'s Dep. 28:18–29:11.) Among Plaintiff's coworkers at Unity Plaza were Housing Assistants Bob Agbai, Fatima Turner, and Diane Harvey. (Defs.' 56.1 ¶¶ 8, 62.) Plaintiff was hired by NYCHA "off the civil service list" as a result of "a lawsuit (not involving . . . [P]laintiff) that required provisional employees to be fired and people on the civil service list to be hired." (Am. Compl. ¶ 7.) After starting his job "at Unity Plaza . . . [, Plaintiff] learned that [he] replaced a provisional secretary [who] worked in that office for [eight] years," which resulted in "considerable hostility toward [him] in [his] workplace in the management office at Unity Plaza, a NYCHA public housing development." (*Id.* ¶¶ 7–8.) Throughout the course of Plaintiff's employment at NYCHA, he was the "only male [s]ecretary." (*Id.* ¶ 9.)

### i. Gender discrimination

Plaintiff claims that he was discriminated against because of his gender and treated less well than the female employees in the office. (*Id.* ¶ 19.) In support, Plaintiff alleges that in contrast to the female secretary whose office was equipped with both air conditioning and windows, (*id.* ¶ 13), his office lacked a window and "the air conditioner that was there for years, was removed shortly after [he] started working in that office at [Harvey's] request," (*id.* ¶ 11).

---

[2] Because the exhibits are not consecutively paginated, the Court refers to the page numbers assigned by the electronic filing system.

Because Plaintiff suffers from asthma and chronic obstructive pulmonary disease, the lack of air flow in his office made it difficult for Plaintiff to breathe, but his requests for air conditioning were repeatedly denied.  (*Id.* ¶ 12.)  In addition, Plaintiff testified that the day he was suspended, as he was packing up to leave, he observed an air conditioner being installed in the office.  (Pl.'s Dep. 239:20–22; Pl.'s 56.1 ¶ 11.)

Plaintiff testified during his deposition that Bazelais repeatedly told him that "[he] was not suited for the job because 'this is a woman's job,'" (Am. Compl. ¶ 24), and assigned him a disproportionately heavy workload, including work beyond the scope of his job description but refused to authorize overtime pay because of his gender.[3]  (Pl.'s Dep. 73:13–74:3.)  On multiple occasions Bazelais said that "[Plaintiff] was a man doing a woman's work and . . . could not do the woman's work as well as a woman could," despite the fact that Plaintiff "was trained [as a secretary] and could type seventy-five words a minute and . . . passed all [his] classes, [and] got a very high score in [his] civil service exam."  (Pl.'s Dep. 112:9–16.)  Bazelais told Plaintiff that

---

[3]  Assistant Manager Traficante testified that he witnessed Plaintiff working until 6:30 PM:

| | |
|---|---|
| Plaintiff: | Exactly. Do you recall me working overtime a number of times we worked together until 6:30 P.M.? |
| Traficante: | What? With me? |
| Plaintiff: | Yes, we would work together until 6:30 some nights. |
| Traficante: | Well I know I stayed overtime a lot — that could be possible — just can't remember all — you know, everything. |
| Plaintiff: | Okay. You would do work in your office and I would be copying dummy folders is that correct? |
| Traficante: | Yes, I think I do recollect that at times. |

(Dep. of Frank Traficante ("Traficante Dep.") 95:16–96:8, annexed to Pl.'s Opp'n as Ex. 7, Docket Entry No. 95-5.)

because "he cannot do the job as good as a woman," he "would have to stay overtime and do more work," but she refused to compensate him for the overtime.[4]

Plaintiff further contends that he was asked to complete tasks outside of his job description and was assigned an overwhelming workload because of his gender. (Pl.'s Counter Stmt. of Undisputed Facts pursuant to Loc. Rule 56.1 ("Pl.'s Counter 56.1") ¶¶ 45, 55, annexed to Pl.'s Opp'n as Ex. 1, Docket Entry No. 95-1.) After Bazelais took over as supervisor, Plaintiff was required to take on tasks that had previously been the responsibility of the housing assistants. (Pl.'s Dep. 40:13–16.) For example, he was asked to make copies of legal folders, (*id.* at 31:4–15), "typ[e] out documents and leases" and "[d]ocuments for a tenant's move-in folder," (*id.* at 40:6–17; 41:3–9), and "call tenants [to] verify their phone numbers," (*id.* at 46:11–47:1). Plaintiff contends that Bazelais sought to sabotage his performance record in order to justify his termination by "giv[ing] Plaintiff work way beyond what was [within his ability and] dut[y] to do, and then "writ[ing Plaintiff] up for not doing [his] own work because [he] didn't have the time." (*Id.* at 47:18–22.)

---

[4] Plaintiff testified that Bazelais also instructed her secretary, Ada Rodriguez, "not to inform" Plaintiff that he would not be paid. (Pl.'s Dep. 74:22–75:7.) Defendants maintain that "Rodriguez's . . . alleged statements regarding [Bazelais' 'order' that she 'remove' Plaintiff's overtime are inadmissible hearsay." (Defs.' Mem. 7.) Plaintiff does not address this argument and it is not evident that any exception to the general hearsay rule applies. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) ("[H]earsay that would not be admissible at trial is likewise not competent evidence on a motion for summary judgment."); *cf. McConville v. Montrym*, No. 15-CV-00967, 2018 WL 4509494, at *4 (N.D.N.Y. Sept. 20, 2018) ("Rules 804(a)(4) and 804(b)(2) of the Federal Rules of Evidence provide an exception to the general bar against hearsay testimony when the declarant is unavailable because of death or illness and the statement at issue is made under the belief of imminent death about its cause or circumstance."). Defendants dispute Plaintiff's testimony and maintain that when he was asked to work overtime, he was paid, but that he "worked one and a half extra hours without approval during the two-week period before his suspension in July 2013, and on one of these days he was late to work." (Defs.' 56.1 ¶ 60 (citing Pl.'s Time Detail 6/24/13–8/1/13, annexed to Lippman Decl. as Ex. 27, Docket Entry No. 90-3); *see also* Bazelais Decl. in Supp. of Defs.' Mot. ("Bazelais Decl.") ¶ 6, Docket Entry No. 89.)

### ii.   Sexual orientation discrimination

Plaintiff contends that Bazelais, Agbai and Harvey frequently made offensive and derogatory comments about "gay people" in his presence.  (*See* Pl.'s Aff. ¶¶ 7–22; *see also* Pl.'s Dep. 156:24–157:3.)  "Between January of 2012 and July 12, 2013, [Bazelais] made frequent and offensive statements endorsing hate crimes against gay people and humiliated [him] by ostracizing . . . , segregating . . . , and treating [him] as inferior to [his] coworkers, all because [Plaintiff is] gay and HIV positive."  (Pl.'s Aff. ¶ 7.)  "On a weekly or biweekly basis, [Bazelais, Agbai, and Harvey] (sometimes [one], [two], or all of them together) would congregate[] by [Plaintiff's] desk and converse[] loudly about the 'sin' of being gay and how gay people deserved to die," (*id.* ¶ 8; *see also* Pl.'s Dep. 97:13–17), and "discuss news reporting hate crimes against gay people or deaths from AIDS-related causes," (Pl.'s Aff. ¶ 20).  On numerous occasions, Harvey, Agbai, and Bazelais remarked in Plaintiff's presence that "being gay is a sin against God"; "God created Adam and Eve, not Adam and Steve"; "gay marriage should not be legal"; and "gay people like to take it up the ass."  (*Id.* ¶ 13.)  At least once, Agbai told Plaintiff that in Agbai's country, "they kill gay people," and quoted the Bible stating "[y]ou shall surely be put to death if you lay with men as you lay with women."[5]  (*Id.* ¶¶ 10, 15.)  Likewise, Harvey told Plaintiff that "gay people 'deserve aids' and that being gay is a 'crime punishable by God' and that when a gay man dies from AIDS-related causes, 'it's [their] fault because [they] have sex with men.'"  (*Id.* ¶ 22.)  On one occasion, Bazelais', Harvey's, and Agbai's "derogatory and

---

[5]  Plaintiff clarified at his deposition that "[w]hen [Agbai] allegedly quoted the [B]ible with respect to putting gay men to death, '[h]e said that in a conversation as [he and Plaintiff] were sitting in the kitchen eating lunch and [they] brought up the gay comments that [were] being made and what he believes.  He was stating what he believed.  He didn't say [Plaintiff] should be put to death.  He was stating what was in the [B]ible, like most straight people do." (Defs.' 56.1 ¶ 72 (second and third alterations in original) (quoting Pl.'s Dep. 98:4–17)).)

offensive statements were so awful" that another Unity Plaza employee "interjected and told

them to 'Stop it.'"  (*Id*. ¶ 17; Pl.'s Dep. 154:23–155:15.)  Each time Bazelais, Agbai, and Harvey

made offensive and derogatory comments about "gay people" in Plaintiff's presence, "they

would look to see [his] reaction," (Pl.'s Aff. ¶ 18), but "[a]lthough [Plaintiff] felt these

conversations to be incredibly offensive, hurtful, anxiety-inducing, angering, and traumatic, [he]

suppressed [his] feelings and tried not to visibly react," (*id*. ¶ 11).

Plaintiff maintains that Bazelais, Harvey, and Agbai were aware of his sexual orientation,

(Pl.'s Dep. 176:2–6), and that Bazelais participated in these offensive conversations with the

intent that Plaintiff would hear, (Pl.'s Aff.  ¶ 9), and never "put a stop to the harassment and

humiliation," (*id*. ¶ 16).  To the contrary, by participating and condoning the conduct, Bazelais

gave Turner permission to bully and harass Plaintiff with impunity, (Pl.'s Counter 56.1 ¶ 48),

and eventually Turner adopted "[t]he same pattern[] Bazelais taught her," by "l[ying] that

[Plaintiff] attacked her and claim[ing] she was afraid of [Plaintiff]," (*id*. ¶ 12).  In "late April [of]

2013," while Plaintiff was entering the office with Turner, she allowed "the door to slam in [his]

face," even after he had held the door open for her and even though he had his bicycle with him.

(Pl.'s Dep. 107:7–13.)  When Plaintiff complained about Turner's conduct to Bazelais,

"[Bazelais] called [him] into her office and first said that [Turner] did not do it, if she did it, she

did not mean to do it[.]  [A]nd if she meant to do it, she was a housing assistant and [he] was just

a secretary, and if [Plaintiff] didn't like it[, he] could quit."  (*Id*. at 107:16–20.)

### iii.   Disability discrimination

Plaintiff testified that he notified Bazelais about his HIV status as soon as she started

supervising him because she observed him taking his HIV medication, (*id*. at 151:22–23; Pl.'s

Aff. ¶ 5), and because Plaintiff's medical condition requires that he drink a lot of water,

necessitating frequent trips to the restroom, (Pl.'s Dep. 149:25–150:2; *see also* Pl.'s Aff. ¶ 4).  In addition, he "had to obtain [Bazelais'] authorization to take medical leaves of absence."  (*Id.* ¶ 3).  Plaintiff claims that when Bazelais learned of his HIV status, she told him "[w]ith God as my witness, I will fire you."  (*Id.* ¶ 12.)  After learning he was HIV positive, Bazelais forced Plaintiff to use the superintendent bathroom sink to "wash [his] dishes and [his] hands" instead of the using the workplace kitchen sink and dishrack, (Pl.'s Dep. 154:4–11; Pl.'s Aff. ¶ 7), and when he asked her about it, she told him he was not permitted to use the kitchen sink and dishrack because she "use[d] that sink,"[6] (Pl.'s Aff. ¶¶ 34– 35).  Plaintiff contends that the superintendent bathroom "was rarely cleaned since it was only intended to be used by the superintendent and the occasional maintenance worker," (*id.* ¶ 30), and that "[b]ecause the back bathroom was infrequently cleaned, it often had no paper towels" for Plaintiff to use to dry his dishes, (*id*. ¶ 32).  For fear of losing his job and his health care, Plaintiff did not complain about this treatment and "used the back bathroom and did not touch the kitchen sink" as directed.  (*Id.* ¶ 43.)

   **b.   Plaintiff's suspension**

   The parties dispute the events that resulted in Plaintiff's one-month suspension from NYCHA on July 12, 2013.  (*See* Letter from NYCHA to Pl. dated July 12, 2013, Docket Entry No. 14-4; Pl.'s 56.1, at 9.)  It is undisputed that there was an argument between Plaintiff and Turner on July 9, 2013, regarding the lack of air flow in Plaintiff's office.  (Defs.' 56.1 ¶ 8; Pl.'s Counter 56.1 ¶ 8.)  Defendants contend that Agbai witnessed the altercation between Plaintiff

---

   [6]  Unity Plaza Housing Assistant Shaunte Williams testified that she did not remember Bazelais prohibiting Plaintiff from using the kitchen sink, claiming to the contrary that "[w]e all used the kitchen sink, including [Plaintiff]" and that she "remember[ed] [Plaintiff] using the kitchen sink."  (Dep. of Shaunte Williams ("Williams Dep.") 6:5–8, annexed to Pl.'s Opp'n as Ex. 6, Docket Entry No. 96-6.)

and Turner and that during the argument, Plaintiff threatened to punch Turner in the face. (Defs.' 56.1 ¶ 8; Emails dated July 15, 2013, at 141, annexed to Lippman Decl. as Ex. 17, Docket Entry No. 90-3.)

Plaintiff maintains that he did not threaten Turner and NYCHA's management convinced Agbai to lie and say otherwise. (Pl.'s Counter 56.1 ¶ 8.) Plaintiff claims that around 9:15 AM his office began to feel hot and after "notic[ing] the door across the hall from [him] was closed," he asked Agbai, whose office was air-conditioned and adjacent to Plaintiff's, if he could open Agbai's office door to help cool Plaintiff's office. (*Id.*) Agbai agreed, but when Plaintiff opened the door, Turner "walked into [Agbai's] office yelling at [Agbai], saying, he knows he needs that door to stay closed," because "his air conditioner was on it[]s last leg." (*Id.*) Turner then closed the door. (*Id.*) Plaintiff again requested and Agbai again gave Plaintiff permission to open the door and told Turner to calm down. (*Id.*) Plaintiff went back to Agbai's office, but Turner blocked the entrance. (*Id.*) Plaintiff turned sideways and went around Turner and asked Agbai not to allow Turner to close the door but he "never spoke a word to Turner." (*Id.*)

Plaintiff then called the NYCHA Borough Office regarding the escalating situation. (*Id.*) It is undisputed that when someone arrived from the Borough Office later that afternoon, that individual informed Plaintiff that because Plaintiff had threatened to punch Turner in the face, Plaintiff would be suspended for workplace violence.[7] (*Id.*; Defs.' 56.1 ¶ 8.) Plaintiff testified

---

[7] The Brooklyn Borough Director of NYCHA, Denise Brockington, wrote to Bazelais' supervisor Marguerite Mann, a Brooklyn Property Management Director, (Pl.'s Counter 56.1 ¶ 50), requesting permission to suspend Plaintiff and explaining that Plaintiff became very hostile, verbally abusive, and threatened to punch Turner in the face, (*id.*; Bazelais Decl. ¶ 4). Mann in turn wrote to Rhonda Kogen, an assistant director in human resources, requesting permission to suspend Plaintiff. (*Id.*)

that "[he] never said anything to [Turner] about punching her in her face, that was a lie she made up to get [Plaintiff] fired."  (Pl.'s Dep. 231:21–24.)

As a result of this incident with Turner, on July 12, 2013, NYCHA suspended Plaintiff for approximately one month.  (Emails dated July 15, 2013, at 140.)

### c.   EEOC Charges

Plaintiff contends that he filed two charges with the EEOC on July 26, 2011, (the "July 2011 EEOC Charge") and in April of 2013 (the "April 2013 EEOC Charge").

### i.   July 26, 2011 EEOC Charge

Plaintiff argues that on July 21, 2011, he and Harvey got into a dispute regarding a tenant issue and that Harvey became abusive — "yelling and cursing at [Plaintiff]" — and, as Plaintiff attempted to back away from Harvey, his "left arm brushed against her left arm," and she "jumped back like she was on fire," and told the assistant manager Frank Traficante, "who was standing in the door just watching [Harvey] stand over [Plaintiff] yelling and cursing," that Plaintiff had struck her arm.  (Pl.'s Counter 56.1 ¶¶ 92–94.)  On July 26, 2011, following the incident with Harvey, Plaintiff filed the July 2011 EEOC Charge reporting workplace violence. (EEOC Letter dated Dec. 2, 2014, annexed to Pl.'s Opp'n as Ex. 20B, Docket Entry No. 95-8; *see also* Pl.'s Dateline of Harassment and Retaliation, annexed to Lippman Decl. as Ex. 28, Docket Entry No. 90-3.)  The record indicates that Plaintiff's July 2011 EEOC Charge was dismissed on November 18, 2011, and a notice of right to sue was mailed to Plaintiff the same day.  (EEOC Letter dated Dec. 2, 2014.)

On July 29, 2011, Traficante issued Plaintiff a counseling memorandum for creating a hostile work environment.  (Pl.'s Dep. 242:1–4.)  Plaintiff testified that in the memorandum Traficante falsely accused "[Plaintiff] of hitting [Harvey] when [Traficante] looked right at

[Harvey] assaulting [Plaintiff], but recognized "[b]ecause [Plaintiff] was a black man, they [could] get away with framing [him] for being a hostile person."[8]  (Pl.'s Dep. 243:25–244:5.)

### ii.  April 2013 EEOC Charge

Plaintiff testified that in late April of 2013, after his exchange with Bazelais regarding Turner slamming the door in his face, "[he] immediately got up from her office, went to [his] desk and started writing out the EEOC report," (*id.* at 107:20–22), that Bazelais came into his office, observed him completing the EEOC Charge, (*id.* at 113:17–23), and said "she could see what [he was] doing and she [knew] what she [could] do and left [his] office," (*id.* at 107:22–23). Plaintiff contends that he filed the EEOC Charge in late April of 2013, (Pl.'s Dep. 82:10–20), but wrote "May 22, 2013," on the EEOC Charge in error and when he went to confirm the date of the "actual [c]omplaint" filed in April of 2013, he "learned [it] was lost due to Hurricane Sandy," (Pl.'s Counter 56.1 ¶ 127).[9]

Two days after Plaintiff claims he filed the April 2013 EEOC Charge, on May 2, 2013, Bazelais issued a counseling memorandum indicating that Plaintiff had engaged "in verbal and physical expressions of hostility" and used "abusive or offensive language or gestures" toward her.  (Pl.'s Dep. 92:19–25; Counseling Memorandum dated May 2, 2013, annexed to Lippman Decl. as Ex. 20, Docket Entry No. 90-3.)  Plaintiff testified that Bazelais issued this

---

[8]  Plaintiff also testified that the counseling memorandum issued on November 19, 2012, was motivated by racial discrimination.  (*See* Pl.'s Dep. 242:2–243:20.)  The Court dismissed Plaintiff's race-based claims in the September 2017 Decision, and therefore does not address Plaintiff's race discrimination claim based on this counseling memorandum.  (*See* Sept. 2017 Decision 28 n.21.)

[9]  Plaintiff attached to the Amended Complaint an unsigned and undated EEOC intake questionnaire (the "April 2013 EEOC Charge").  (EEOC Questionnaire 11–14, annexed to Am. Compl. as Ex. A, Docket Entry No. 14-1.)

memorandum as retaliation for him filing the April 2013 EEOC Charge.  (Pl.'s Dep. 115:15–19;
118:6–11.)

Defendants dispute that Plaintiff filed an EEOC Charge in April of 2013, and maintain
that Plaintiff completed an "EEOC intake questionnaire" at that time, but that Bazelais "never
saw Plaintiff complete an EEO[C] [C]harge or any other EEO[C] document and did not know
that Plaintiff complained to the EEOC until after he filed his lawsuit."  (Defs.' 56.1 ¶¶ 133, 135.)
Defendants submit as evidence a NYCHA "notice of charge of discrimination, EEOC [C]harge
number 520-2013-02744, dated May 26, 2015, with no charge attached."  (Defs.' 56.1 ¶ 128
(citing Notice of Charge, annexed to Lippman Decl. as Ex. 34, Docket Entry No. 90-3).)
Included with the Notice of Charge is a letter dated May 26, 2015, from EEOC Supervisory
Investigator John B. Douglass to NYCHA's counsel indicating that "[o]ur records reflect that a
document meeting the definition of an EEOC Charge was received by our office on July 29,
2013, but, due to an error on the part of our office, it was not processed and notice was not
served according to our usual procedures."  (Defs.' 56.1 ¶ 128 (citing Notice of Charge).)
Defendants maintain that NYCHA received the May 26, 2015 letter on June 2, 2015, and that
Bazelais did not learn of the April 2013 EEOC Charge, or any other EEOC Charge, until the
commencement of this litigation.  (Defs. 56.1 ¶ 135 (citing Bazelais Dep. 26:16-–23, 30:9–21,
34:13–17, 38:3–21, 39:23–40:6, annexed to Lippman Decl. as Ex. 8, Docket Entry No. 90-2).)

On June 10, 2015, after receiving the EEOC's letter to NYCHA regarding the status of
the April 2013 EEOC Charge, Plaintiff filed a supplement to the charge ("June 2015
Supplement"), (EEOC Docs. 9–10, annexed to Am. Compl. as Ex. 1, Docket Entry No. 14-1),
alleging "false charges made by Diane Harvey," "harassment and name calling and unfair
treatment by female staff members, including Diane Harvey, Marie Bazelais, and Fatima

15

Turner," and "disparate treatment in comparison to female secretaries," as well as a claim that Plaintiff was unjustly terminated and did not receive a fair termination hearing.  (*Id.*)  Plaintiff signed and notarized the June 2015 supplement.  (*Id.*)

The EEOC issued a right to sue letter on September 25, 2015.  (Dismissal and Notice of Right to Sue, annexed to Lippman Decl. as Ex. 1, Docket Entry No. 90-1.)

### d.   Employment at Garvey Plaza

On August 14, 2013, at the conclusion of Plaintiff's suspension, he was transferred from Unity Plaza to Garvey Plaza where he worked under the supervision of Regina Chu until April 1, 2014.  (Human Resources R. Card; Pl.'s Counter 56.1 ¶ 47.)

Plaintiff contends that the discrimination and harassment continued at Garvey Plaza and that Bazelais and Chu spoke regularly prior to his transfer.  (Pl.'s Aff. ¶ 47.)  Chu "humiliated [Plaintiff] by holding town-hall type meetings" with the office staff to discuss Plaintiff's medical leave and health issues.  (Am. Compl. ¶ 18; Pl.'s Aff. ¶ 49.)  On one occasion, despite the fact that Plaintiff had notified Chu that he would be late to work because he needed to pick up his HIV medication, she "criticized" him for being late in the presence of four other employees — two housing assistants, the superintendent, and a maintenance employee.  (Pl.'s Aff. ¶ 50.)  On another occasion, Chu discussed Plaintiff's upcoming "prothesis surgery" during a staff meeting, (*id.* ¶ 51), and once when he attempted to notify the office that he would be absent because he was sick due to complications from his HIV status, Chu refused to answer his calls and recorded him absent without leave, (*id.* ¶ 55).

Defendants contend that housing assistant Shelly Moore and Garvey Plaza superintendent Omar Ortiz, never witnessed, heard of, or were informed that Chu discussed Plaintiff's health issues or medical leaves during staff meetings.  (Defs.' 56.1 ¶¶ 115–120.)  Defendants further

dispute that Chu marked Plaintiff absent without leave, but instead maintain that she issued him a counseling memorandum dated February 21, 2014, "discussing Plaintiff's failure to hand in a leave of absence form and inform her prior to his absence." (*Id.* ¶ 122; Counseling Mem. dated Feb. 21, 2014, annexed to Lippman Decl. as Ex. 32, Docket Entry No. 90-3.)  In support, Defendants contend that "Plaintiff's payroll records indicate that Plaintiff was paid every day he worked at Marcus Garvey between August 14, 2013, and March 31, 2014," (Defs.' 56.1 ¶ 124), and that Plaintiff "was not paid for one day when he was absent from work, [because he] had insufficient accrued leave time for the absence, and therefore was marked LWOP, meaning leave without pay — not AWOL," (*id.* ¶ 124).

On March 13, 2014, Chu requested Plaintiff's transfer to another location due to his "erratic and irrational behavior," which was "disruptive thus creating a hostile work environment" and causing Chu and another employee to feel unsafe and threatened.  (Mar. 13, 2013 Email from Chu, annexed to Lippman Decl. as Ex. 30, Docket Entry No. 90-3.)  On April 1, 2014, Plaintiff was transferred to Louis Armstrong.  (Defs.' 56.1 ¶¶ 125–126.)

### e.    Plaintiff's trial pursuant to Civil Service Law Section 75

On January 16, 2014, Defendants served Plaintiff "with three charges of incompetency or misconduct in anticipation of a Civil Service Law Section 75 General Trial"[10] (the "Section 75 Trial"), regarding Plaintiff's alleged workplace misconduct, including the July 9, 2013 dispute over the air conditioning with Turner, (Defs.' 56.1 ¶ 15 (citing Jan. 16, 2014 Letter to Pl. from Sharon Samuel, Deputy Director of Human Resources ("HR Letter"), annexed to Lippman Decl. as Ex. 19, Docket Entry No. 90-3)).  The charges against Plaintiff were: (1) "[o]n or about July 9,

---

[10]  Section 75 of the Civil Service Law provides that covered employees "may be subject to disciplinary action in the form of local disciplinary hearings and General Trials pursuant to Section 75 of the [New York] Civil Service Law."  (Defs.' 56.1 ¶ 5.)

2013," Plaintiff "threatened to harm a coworker, [Turner], . . . engaged in verbal expressions of hostility. . . and used abusive or offensive language or gestures directed at [Turner]," (HR Letter ¶ 1); (2) "[o]n or about May 1, 2013," Plaintiff "engaged in verbal and physical expressions of hostility . . . [and] used abusive or offensive language or gestures directed at [Bazelais], . . . failed to make a copy of a check that needed to be sent out . . . [and falsely claimed] that the Property Manager had instructed [Plaintiff] to mail out checks without first making a copy of the check," (*id* ¶ 3); and (3) "[o]n or about June 10, 2013," Plaintiff failed to "perform [his] duties in a satisfactory manner" by telling a "tenant to enter the office of a Resident Services Associate without the Resident Services Associate being aware" that Plaintiff had done that, and by falsely claiming that "the Property Manager had told [him] that if there are many tenants in the lobby, [he] should send them into a Resident Services Associate's office," (*id.* ¶ 2). Defendants maintain that Bazelais was on vacation when the Brooklyn Property Management Department prepared and submitted the request for the trial in Bazelais' name and that Bazelais only learned of the request for a trial when she returned from vacation. (Defs.' 56.1 ¶ 12.) In support of the charges, Defendants provided two counseling memoranda dated May 2, 2013, and July 2, 2013. (Counseling Mem. dated May 2, 2013, annexed to Lippman Decl. as Ex. 20, Docket Entry No. 90-3; Counseling Mem. dated July 2, 2013, annexed to Lippman Decl. as Ex. 20, Docket Entry No. 90-3), and the email correspondence regarding the July 9, 2013 incident involving Turner, (Emails dated July 15, 2013).

After hearings on March 25, 2014, and May 8, 2014, where Plaintiff was represented by counsel, by report and recommendation dated August 11, 2014, the trial officer found Plaintiff guilty of all charges and recommended that NYCHA terminate Plaintiff's employment. (Defs.' 56.1 ¶ 19; NYCHA R&R 173–76, annexed to Lippman Decl. as Ex. 22, Docket Entry No. 90-3.)

18

NYCHA approved the trial officer's recommendation of dismissal and terminated Plaintiff's employment effective September 26, 2014.  (Defs.' 56.1 ¶ 31.)

Plaintiff appealed the decision to the New York City Civil Service Commission (the "CSC"), and on March 19, 2015, the CSC heard oral argument on Plaintiff's appeal.  (May 27, 2015 Decision of the CSC ("CSC Decision") 183, annexed to Lippman Decl. as Ex. 24, Docket Entry No. 90-3; Defs.' 56.1 ¶¶ 32–34.)  On March 25, 2015, Plaintiff filed a motion for reconsideration based on ineffective assistance of counsel during his hearing before the CSC.  (Defs.' 56.1 ¶ 32; CSC Decision 184–85.)  On May 27, 2015, the CSC denied Plaintiff's motion for reconsideration based on ineffective assistance of counsel and upheld the trial officer's decision recommending that NYCHA terminate Plaintiff's employment.  (CSC Decision 85; Defs.' 56.1 ¶ 34.)

On September 14, 2015, Plaintiff filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in New York State Supreme Court, New York County (the "State Court"), challenging the CSC's decision, arguing that the witnesses provided false testimony, that the charges against him were retaliatory, and that his due process rights were violated during Section 75 Trial because he was denied or limited in his right to speak during the hearing.  (*Id.* ¶ 35; Notice of Entry and Order and J. of the Supreme Ct., County of New York, dated April 4, 2016 ("State Court Decision") 191–192, annexed to Lippman Decl. as Ex. 25, Docket Entry No. 90-3.)  On April 4, 2016, the State Court denied Plaintiff's Article 78 petition, finding that: (1) "[NYCHA's] conduct in preventing or limiting petitioner from speaking during oral argument [did] not constitute a denial of due process rights, as he was represented by counsel, and [NYCHA] duly considered [Plaintiff's] post-argument submissions.  [And] [m]oreover, whether to afford a party argument is within [NYCHA's] discretion [under Civil Service Law

§ 76(2)], and [Plaintiff did] not substantiate any of his allegations with a transcript or other proof"; and (2) Plaintiff's allegations that the charges against him were retaliatory and "that certain adverse witnesses suborned false testimony with NYCHA's knowledge, while serious, [were] unsupported and based entirely on conjecture" and "fall[] far short of demonstrating that [the CSC] acted unconstitutionally, illegally, or in excess of its jurisdiction in affirming NYCHA's determination." (State Ct. Decision; *see also* Defs.' 56.1 ¶ 35).)

Plaintiff contends that the charges in support of the Section 75 Trial were false, (Pl.'s Counter 56.1 ¶ 16), and NYCHA's case at the trial was based on lies, (*id.* ¶ 8).

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y*, 982 F.3d 139, 142 (2d Cir. 2020); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury

could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

In cases that involve claims of discrimination, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)) (citing *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to . . . other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Striking this balance requires that "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Meiri*, 759 F.2d at 998); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz*, 258 F.3d at 69 (quoting *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997)) (citing *Abdu–Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 466 (2d Cir. 2001)).

b.   **Title VII and NYSHRL gender discrimination claims and NYSHRL disability discrimination claim[11]**

Plaintiff claims that Defendants discriminated against him based on his gender in violation of Title VII and the NYSHRL by assigning him a disproportionately heavy workload, which included non-secretarial work, denying him overtime pay, issuing him counseling and instructional memoranda, and ultimately terminating from his role at NYCHA.  (Am. Compl. ¶¶ 29, 44, 77–78; Pl.'s Dep. 243:23–244:5.)  In addition, Plaintiff claims that Defendants discriminated against him on the basis of his disability in violation of the NYSHRL by denying him access to the workplace kitchen at Unity Plaza and denying him a leave of absence due to this medical condition at Garvey Plaza.[12]

Claims of employment discrimination under Title VII and the ADA are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 74–75 (2d Cir. 2013) (applying *McDonnell Douglas* framework to Title VII gender discrimination claim); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (applying framework to ADA

---

[11]  Because the gravamen of Plaintiff's sexual orientation-based allegations is that he was subjected to a pattern of hostility and abuse by Defendants due to his sexual orientation, the Court construes Plaintiff as asserting a hostile work environment claim against Defendants on the basis of his sexual orientation.

[12]  As the Court explained in the September 2017 Decision, because Plaintiff failed to raise his claims based on sexual orientation and disability in the April 2013 EEOC Charge or the June of 2015 Supplement, those claims are unexhausted.  (Sept. 2017 Decision 41 n.29 (citing *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) ("Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency.")).)  However, because there is no exhaustion requirement under the NYSHRL and the NYCHRL, *Ross-Caleb v. City of Rochester*, 512 F. App'x 17, 17–18 (2d Cir. 2013), the Court considers whether Plaintiff establishes a claim of discrimination based on his sexual orientation or disability under the NYSHRL or the NYCHRL.

disability discrimination claim). Claims of gender- and disability-based discrimination under the NYSHRL are analyzed under the same standard as gender and disability discrimination claims under Title VII.[13] *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' [to Title VII claims] and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999))). Under this framework, a plaintiff must first establish a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) "[he] belongs to a protected class; (2) [he] was qualified for the position in question; (3) [he] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of gender discrimination." *Mills*, 519 F. App'x at 75; *see also Doe v. City of New York*, 473 F. App'x 24, 27 (2d Cir. 2012). A plaintiff's burden at this stage is "minimal." *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506); *Kelleher v. Fed A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("A plaintiff's burden to establish an initial *prima facie* case is, by design, 'minimal and de minimis.'" (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Miceli v. Mehr*, 830 F. App'x

---

[13] In June of 2019, New York State Legislature amended the NYSHRL, "the effect of which is to render the standard for claims [brought under the NYSHRL] closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019); *see also* A8421/S6577 (as amended by S6594/A8424). Because the amendments apply to claims accruing after October 11, 2019, *see Wellner*, 2019 WL 4081898, at *5 n.4; A8421/S6577 (as amended by S6594/A8424), the date that the amendments go into effect, they do not apply to Plaintiff's NYSHRL claims.

63, 65 (2d Cir. 2020) (quoting *Treglia*, 313 F.3d at 719).  The defendant's burden "is not a particularly steep hurdle."  *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012).  It "is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).  If the defendant offers a legitimate, nondiscriminatory explanation for its action, the court must nevertheless deny summary judgment if the plaintiff can show that the explanation was pretext.  *See Williams v. Mount Sinai Med. Ctr.*, 859 F. Supp. 2d 625, 641 (S.D.N.Y. 2012) (citing *Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 294 (S.D.N.Y. 2005)).

### i.   Title VII and NYSHRL gender discrimination claims

The parties do not dispute that (1) Plaintiff's gender places him in a protected class, (2) that he was qualified for the position, and that (3) Defendants' decision to terminate him constituted an adverse employment action.  (*See generally* Defs.' Mem.)  Defendants argue that Plaintiff fails to establish a prima facie case because (1) he did not suffer any adverse employment action other than his termination, and (2) he cannot establish that his termination was motivated by discriminatory intent.  (Defs.' Mem. 14–15.)

Plaintiff argues that in addition to his termination, he was assigned a disproportionately heavy workload, including non-secretarial tasks, forced to work overtime without compensation, and issued counseling and instructional memoranda for discriminatory reasons.  (Am. Compl. ¶¶ 29, 44, 77–78; Pl.'s Opp'n ¶ 4.)

### 1.   Prima facie case

For the reasons detailed below, the Court finds that Plaintiff has established a prima facie case of gender discrimination as to Defendants' (1) assignment of a disproportionately heavy

workload, and (2) failure to fully compensate his overtime work.  However, Plaintiff fails to establish circumstances which give rise to an inference of discrimination and therefore cannot make out a prima facie case of gender discrimination as to the: (1) assignment of non-secretarial work, (2) the issuance of counseling memoranda, or (3) his termination following the Section 75 Trial.

### A.   Adverse employment actions

Given that the parties do not dispute that Plaintiff's termination following the Section 75 Trial constituted an adverse employment action, (*see* Defs.' Opp'n 14), the Court considers whether Plaintiff suffered adverse action by (1) being assigned non-secretarial work; (2) being assigned a disproportionately heavy workload; (3) being denied full compensation for his overtime work; and (4) being issued counseling memoranda.

### (1)   Non-secretarial work and disproportionate workload

Defendants do not address Plaintiff's arguments regarding the assignment of a disproportionately heavy workload but argue that "the undisputed evidence shows that Plaintiff was assigned job tasks consistent with his Secretary [L]evel 3A assignment."  (Defs.' Reply 6.)

Plaintiff testified that when Bazelais became his supervisor he "was assigned many other duties that were not a part of [his] title," (Pl.'s Dep. 29:24–25), including copying "legal documents from the tenant file," (*id*. at 33:17–19), "mak[ing] new tenant folders for the move-in tenants," (*id*. at 34:6–7), "typ[ing] out leases" and other documents for the "tenant's move-in folder," (*id.* at 40:21–41), and "call[ing] tenants and verify[ing] their phone numbers," (*id*. at 46:11–12).  In explaining why he believed these duties were beyond the scope of his title, Plaintiff testified that (1) he had not been required to perform these tasks prior to Bazelais' tenure and instead, these tasks were performed by the housing assistants, (*id*. at 44:11–23), and

(2) "the manager['s] secretary [Rodriguez] never had to do those [tasks]," (*id.* at 44:20–23). Plaintiff also argues that Bazelais gave him "excessive assignments," and a heavier workload than she assigned to the female secretary.  (Pl.'s Dep. 44:21–45:10; 73:16.)

Requiring employees to perform tasks outside of their job description may constitute an adverse employment action "if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013) (quoting *Galabya v N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000)); *see also Velasquez v. Gates*, No. 08-CV-2215, 2011 WL 2181625, at *10 (E.D.N.Y. June 3, 2011) (same).

In addition, assigning a disproportionately heavy workload on the basis of a protected characteristic under certain circumstances may also constitute adverse employment action.  *See Rodriguez-Coss v. Barr*, 776 F. App'x 718 (2d Cir. 2019) ("[T]he assignment of a disproportionately heavy workload can constitute an adverse employment action." (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)); *Lopez v. Flight Servs. & Sys., Inc.*, 881 F. Supp. 2d 431, 441 (W.D.N.Y. 2012) ("[A] [d]isproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status . . ." (quoting *Chako v. Connecticut*, No. 07-CV-1120, 2010 WL 1330861, at *7 (D. Conn. Mar. 30, 2010))); *see also Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004) (finding that being subjected to "an excessive workload" could be an adverse employment action); *Edwards*, 957 F. Supp. 2d at 211 ("[T]he 'assignment of a disproportionately heavy workload' can constitute an adverse employment action." (alteration in original) (quoting *Grana v. Potter*, No. 06-CV-1173, 2009 WL 425913, at *12 (E.D.N.Y. Feb. 19, 2009))).

Although Plaintiff argues that Defendants assigned him tasks beyond the job responsibilities of a Level 3A Secretary, the evidence before the Court establishes that the tasks assigned to Plaintiff are within the duties and responsibilities of a Level 3A secretary.  Plaintiff testified that his job responsibilities included "typing, faxing, copying, shredding," (Pl.'s Dep. 29:22–23), and the Civil Service Job Specification Sheet provides that the responsibilities of the Level 3A Secretary include "[s]erving as secretary to a high-level employee relieving principal of routine duties and perform[ing] general office work including scheduling appointments," (Civil Service Job Specification Sheet 94).  Thus, the duties Plaintiff complains about fall within the description of responsibilities of a Level 3A Secretary.  Therefore, based on Plaintiff's testimony about his job duties and the Job Specification Sheet, no reasonable jury would find that the allegedly non-secretarial tasks Plaintiff identified — copying legal documents, making new tenant folders, typing out leases, preparing the tenants' move-folders, and verifying tenants' phone numbers — constitute tasks beyond the scope of Plaintiff's job description.  In addition, because the duties of Level 3A Secretaries entail relieving principals of routine tasks and general office tasks, (Civil Service Job Specification 94), which would reasonably encompass making photocopies of folders and files, or gathering relevant information from tenants, as directed by Plaintiff's superiors, these actions also do not constitute adverse employment actions.  *See Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2009) ("To be materially adverse, a change in working conditions must be more disruptive than mere inconvenience or an alteration of job responsibilities.  Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation. (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004))); *see also Lee*

27

*v. N.Y.S. Dep't of Health*, No. 98-CV-5712, 2001 WL 34031217, at *15 (S.D.N.Y. Apr. 23,

2001) (finding no adverse employment action where plaintiff complained that it was not within

the scope of her job description to "investigate complaints against physician and physician

assistants," but the site the plaintiff worked for was responsible for "investigating complaints of

professional misconduct by licensed physicians" and therefore plaintiff did not establish that the

"duties she was performing were inconsistent with the role of her division or how they

diminished [the] plaintiff's job responsibilities"); *cf. Kelly v. N.Y.S. Off. of Mental Health*, 200 F.

Supp. 3d 378, 396–97 (E.D.N.Y. 2016) (finding no adverse action where the plaintiff alleged she

was "given additional work" because she failed to allege the nature of the work or that it "was

outside of her general responsibilities").

However, the record supports Plaintiff's claim that his workload was heavier than

Rodriguez — a similarly situated female secretary[14] — and that it negatively impacted Plaintiff's

performance record as he "was written up for not [completing all the assigned work] because

[he] didn't have the time, so [he] was set up to fail," and so that his termination might later be

justified. (Pl.'s Dep. 47:18–22.) Plaintiff testified that the volume of documents he was

responsible for copying was excessive and fell disproportionately on him, such that "[s]ome days

[he] had to stay most of the night to copy tenant folders, [and Bazelais] would pay [Plaintiff] up

to six-thirty but [he] would have to stay till seven-thirty, eight-thirty, sometimes nine-thirty, ten

o'clock" to complete the work. (*Id.* at 69:16–19.) Further, Plaintiff testified that prior to

Bazelais' tenure as his supervisor, the housing assistants would prepare their own "dummy

---

[14]   Neither side directly addresses whether Plaintiff and Rodriguez are similarly situated, but Plaintiff's April 2013 EEOC Charge indicates that Rodriguez, like Plaintiff, was a "Level 3 Secretary." (Apr. 2013 EEOC Charge ¶ 13.) Plaintiff also testified that Rodriguez was the "manager's secretary." (*See* Pl.'s Dep. 93:17–19.) The Civil Service Job Specification does not define "Secretary Level 3." (*See* Civil Service Job Specification.)

folders" — folders containing "legal documents from the tenant file . . . that could be used to evict [the tenants]" — in preparation for court. (*Id.* at 33:9–19, 45:11–46:6.) Plaintiff would assist the housing assistants in the preparation of these dummy folders by making copies of certain documents from the tenant's file, but it "would take [him] five minutes to copy one or two documents." (*Id.* at 32:18–20.) After Bazelais transferred to Unity Plaza, the division of labor shifted and as a result, Plaintiff was required "to copy ten or twelve folders a day which would take [him] the whole afternoon away from [his] desk and put [him] in a copy room with no air conditioning and two copy machines generating heat." (*Id.* at 32:18–24.) According to Plaintiff's testimony, Rodriguez was "never ordered to sit in the copy room day after day, every afternoon making folders," but Plaintiff "had to do that [and n]o one else had to do that before or since." (*Id.* at 44:18–3; *see also* Am. Compl. ¶ 13.) In light of Plaintiff's testimony and the evidence in the record, a disputed issue of material fact exists regarding whether Plaintiff was assigned a larger workload than Bazelais' similarly situated female secretary because of his gender. *See Feingold*, 366 F.3d at 153 ("If a trier-of-fact credited" the plaintiff's allegations "that [the plaintiff] and his white colleague . . . were assigned a heavier docket . . . than their African-American counterparts . . . it could conclude that [plaintiff] was subjected to disparate treatment under circumstances giving rise to an inference of racial discrimination.").

Thus, although Plaintiff has failed to establish that he was assigned non-secretarial tasks, a reasonable jury could find that Plaintiff suffered an adverse employment action based on being assigned a disproportionately heavy workload.

### (2)   Failure to pay overtime

Defendants argue that Plaintiff's overtime claim fails because (1) "[t]here is no evidence that [Bazelais] failed to pay Plaintiff overtime on any occasion that she authorized his overtime

— and her authorization was required for Plaintiff to work overtime, as she told Plaintiff," (Defs.' Mem. 16); and (2) Plaintiff's testimony that Bazelais gave him extra work but refused to compensate him for the overtime, is contradicted by Bazelais' sworn testimony that "'every time' she required Plaintiff to work overtime, he got paid," (Defs.' Reply 7 (citing Bazelais Dep. 46:16-47:6)).

Plaintiff argues that he was "forced to do extra work, work overtime without pay to do the extra work," and penalized for not being able to complete the work on time.  (Pl.'s Counter 56.1 ¶¶ 39–40.)

Failure to pay overtime wages for additional hours worked may under certain circumstances be an adverse employment action.  *See Annis v. County of Westchester*, 136 F.3d 239, 248 (2d Cir. 1998) (holding that abolishing regular overtime pay so as to deprive one employee of such pay was an adverse employment action under section 1983); *Damon v. United Parcel Serv.*, No. 04-CV-746, 2010 WL 4340828, at *7 (W.D.N.Y. Nov. 2, 2010) (recognizing that the denial of overtime pay may rise to the level of a material change in the terms and conditions of employment).

There is a disputed issue of fact as to whether Bazelais knowingly required Plaintiff to work overtime but refused to authorize the overtime payment.  While Bazelais testified otherwise, (*see* Bazelais Dep. 46:19–47:6), Plaintiff testified that Bazelais gave him excessive work, but refused to authorize compensation for the full overtime period, requiring Plaintiff to "punch out at a certain time, six-thirty, but [to complete all the assigned tasks he] would have to work till eight, nine, ten o'clock at night [and he] was not paid for that," (Pl.'s Dep. 76:6–8). This conflicting testimony about a material fact must be decided by a jury.  Moreover, as indicated above, Traficante supports Plaintiff's claim in some respects.  Traficante recalled

Plaintiff working overtime but did not recall whether Rodriguez had notified Traficante

regarding discrepancies in Plaintiff's timecards or otherwise indicated that Plaintiff was denied

overtime pay.  (Traficante Dep. 80:5–15, 80:25–81:3.)  Because Plaintiff's testimony contradicts

that of Bazelais, (Defs.' 56.1 ¶ 60), the Court cannot conclude as a matter of law that Plaintiff

was not denied overtime pay to which he was entitled and therefore suffered an adverse

employment action.  *See Sethi v. Narod*, 12 F. Supp. 3d 505, 524 (E.D.N.Y. 2014) (finding

"denial of overtime compensation . . . to be [an] adverse employment action[] for purposes of the

motions for summary judgment"); *Ebanks v. N.Y.C. Dep't of Envt'l Prot.*, No. 05-CV-3172,

2009 WL 891796, at *4 (E.D.N.Y. Mar. 31, 2009) (finding that "failure to authorize overtime

and/or compensatory time" was an adverse employment action).  A reasonable jury could credit

Plaintiff's testimony and conclude that based on gender discriminatory reasons, Bazelais failed

to authorize the overtime she required Plaintiff to work.  *See Anderson v. N.Y.C. Dep't of Fin.*,

No. 19-CV-7971, 2021 WL 168476, *2 (S.D.N.Y. Jan. 19, 2021) (finding that although it was

"unclear . . . whether [d]efendant authorized [plaintiff] to work overtime and then refused to pay

him for that time," failure to pay overtime hours constitutes an adverse employment action under

Title VII).

### (3)   Counseling and instructional memoranda

Defendants argue that "[c]ounseling and instructional memoranda are not disciplinary

actions," (Defs.' 56.1 ¶ 4), and therefore do not qualify as adverse employment action.  In

support, Defendants maintain that "[a] counseling memorandum may record particular events or

conduct that could be construed as misconduct or incompetent performance and can serve as

evidence that an employee was put on notice regarding specific misconduct or incompetent job

performance; an instructional memorandum provides formal written instructions to an

employee."  (*Id.*)

31

Plaintiff argues that the July 29, 2011 counseling memorandum from the administrator, Harry Rodriguez for creating a hostile work environment, was motivated by gender discrimination.[15]  (Pl.'s Dep. 243:25–244:5.)  In support, Plaintiff argues that the memorandum was issued based on Traficante's false statement accusing "[Plaintiff] of hitting [Harvey] when [Traficante] looked right at [Harvey] assaulting [Plaintiff]," but recognized "[b]ecause [Plaintiff] was a black man, they [could] get away with framing [him] for being a hostile person."[16]  (*Id.* at 243:25–244:5.)  On July 26, 2011, following the incident with Harvey, Plaintiff filed the July 2011 EEOC Charge, regarding workplace violence.  (EEOC Letter dated Dec. 2, 2014; *see also* Pl.'s Dateline of Harassment and Retaliation.)  The record indicates that Plaintiff's July 2011 EEOC Charge was dismissed on November 18, 2011, and a notice of right to sue was mailed to Plaintiff the same day.  (EEOC Letter dated Dec. 2, 2014.)

Negative written evaluations or reprimands are adverse employment actions if they affect an employee's terms and conditions of employment, such as promotion, wages, or termination. *Farina v. Branford Bd. of Educ*., 458 F. App'x 13, 17 (2d Cir. 2011) (holding, in the context of an ADA claim, that "[w]hile negative employment evaluation letters[] or reprimands may be

---

[15]  Plaintiff received a total of nine counseling memoranda throughout his tenure at NYCHA.  Defendants identified the following counseling memorandum as exhibits during Plaintiff's deposition: (1) counseling memorandum from Harry Rodriguez dated July 29, 2011; (2) counseling memorandum from Bazelais dated August 3, 2012; (3) counseling memorandum from Traficante dated November 19, 2012; (4) counseling memorandum from Traficante dated January 8, 2013; (5) counseling memorandum from Traficante dated March 22, 2013; (6) counseling memorandum from Traficante dated April 8, 2013; (7) counseling memorandum from Traficante dated April 19, 2013; (8) counseling memorandum from Bazelais dated May 2, 2013; and (9) counseling memorandum from Traficante dated July 2, 2013.  (Pl.'s Dep. 241:24–243:12.)

[16]  Plaintiff also testified that the counseling memorandum issued on November 19, 2012, was motivated by racial discrimination.  Because the Court dismissed Plaintiff's race-based claims in the September 2017 Decision, the Court does not address Plaintiff's race discrimination claim based on this counseling memorandum.  (*See* Sept. 2017 Decision 28 n.21.)

considered adverse employment actions, here there was no proof that this evaluation had any effect on the terms and conditions of [plaintiff's] employment" (citations and internal quotation marks omitted)); *see also Weeks v. N.Y.S. (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (holding that a "notice of discipline" and "counseling memo" was not an adverse action because the plaintiff did "not describe its effect or ramifications, how or why the effect would be serious, [or] whether it went to any file"), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Kalola v. Int'l Bus. Machs. Corp.*, No. 13-CV-7339, 2015 WL 861718, at *7 (S.D.N.Y. Feb. 3, 2015) (finding that negative performance reviews that led to probation and then termination were adverse employment actions).

Plaintiff does not argue that the counseling memorandum dated July 29, 2011 impacted the terms or conditions of his employment or that Defendants relied on this memorandum to terminate Plaintiff's employment,[17] and has therefore failed to establish that this counseling memorandum constitutes an adverse employment action.[18]

---

[17] When asked why Plaintiff believes the counseling memorandum dated July 29, 2011, is connected to his termination several years later in 2014, Plaintiff testified that that it was part of a larger pattern of "trying to get [him] terminated for violence, and that's how it ended up, with [him] being accused of violence, because it was a set up to get [him] fired." (Pl.'s Dep. 238:7–13.) As discussed above, because Plaintiff does not allege that the counseling memorandum led to a period of probation or had some other material impact on the conditions of his employment, his speculation that it was part of a larger conspiracy to precipitate his termination is insufficient to establish that the memorandum qualifies as an adverse employment action. *See Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 66 (S.D.N.Y. 2016) ("'[A]n inference,' the Second Circuit has noted, 'is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist.'" (alteration in original) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

[18] Because Plaintiff does not allege that that the lack of air conditioning materially affected his ability to perform his job, the lack of air conditioning does not constitute a material adverse employment action. The Court, however, considers Plaintiff's allegation that he was denied air conditioning in discussing his hostile work environment claim.

### B.   Inference of discrimination

The Court considers whether the adverse employment actions — (1) assigning Plaintiff a disproportionately heavy workload, (2) failing to compensate Plaintiff for overtime work, and (3) terminating his employment — give rise to an inference of discrimination necessary to establish a prima facie case of gender discrimination.

Defendants contend that Plaintiff was terminated upon the recommendation of the trial officer after finding Plaintiff guilty of "threaten[ing] to punch [Turner] in the face, as well as additional misconduct and/or incompetency documented in counseling memoranda from . . . Traficante . . . and . . . Bazelais." (Defs.' Mem. 1.)  Defendants do not directly address Plaintiff's argument that he was assigned an excessive workload compared to the female secretary but argue that he was "assigned job tasks consistent with his Secretary [L]evel 3A assignment," (Defs.' Reply 6), and that there is no evidence that Bazelais' failure to authorize Plaintiff's overtime pay is related to Plaintiff's gender, (Defs.' Mem. 16).

Plaintiff testified that "[he] was terminated for retaliation for that lawsuit and complaints about harassment and bullying [he] suffered while working for New York City Housing Authority." (Pl.'s Dep. 239:7–10.)  In addition, Plaintiff argues that "[t]he charges in support of [his] [G]eneral Trial were false, and based on retaliation for the [April] 2013 EEOC Charge . . . , and for being a Male, Gay, HIV Positive person working as a Secretary [3]A." (Pl.'s Counter 56.1 ¶16.)  With respect to the disproportionately heavy workload, Plaintiff testified that Bazelais gave him "excessive assignments requiring [him] to work overtime and then would refuse to authorize the overtime pay," and that she "treated [him] the way she did because [he] was a man." (Pl.'s Dep. 73:16–25.)  In support, Plaintiff testified that Bazelais said "because [he is] a man, [he] cannot do the job as good as a woman [and] would have to stay overtime and do more

work that she gave [him] because she felt [he] couldn't do [his] job as well as a woman." (*Id.* at 74:14–17.)  However, despite insisting that Plaintiff work overtime, Plaintiff testified that Bazelais would refuse to fully compensate him for his work.  For example, when he had to stay late making copies of the tenant folders, "[B]azelais would pay [him] up to six-thirty but [he] would have to stay [until] seven-thirty, eight-thirty, sometimes nine-thirty, ten o'clock." (*Id.* at 69:14–19.)  Plaintiff further testified that he was "set up to fail" in order to justify his termination, as Bazelais would assign "work way beyond what [he] was able to do" and then penalize him for not completing his other secretarial tasks in time.  (*Id.* at 47:18–22.)

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (quoting *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-CV-1707, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006))).  "A showing of disparate treatment — that is, a showing that the employer treated [the] plaintiff less favorably than a similarly situated employee outside [her] protected group — is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Wegmann v. Young Adult Inst., Inc.*, --- F. App'x ---, ---, 2021 WL 3573753, *4 (2d Cir. Aug. 13, 2021) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  "Because the district court is not to resolve issues of fact on a summary judgment motion, 'its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be

35

sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Abdelal v. Police Comm'r*, 857 F. App'x 30, 31 (2d Cir. May 21, 2021) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).  An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 41 (2d Cir. 2017) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)), or by showing that an employer treated an employee "less favorably than a similarly situated employee outside his protected group," *Toussaint v. NY Dialysis Servs., Inc.*, 706 F. App'x 44, 45 (2d Cir. 2017) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *see also Gagliardi v. Sacred Heart Univ.*, 855 F. App'x 1, 3 (2d Cir. 2021) (same).  "In assessing the record to determine whether there is a genuine issue to be tried," a court is obliged to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

Verbal comments may give rise to an inference of discriminatory motivation where a plaintiff alleges a nexus between the remarks and the alleged adverse action.  *See Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004).  "[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they

prove that the action was motivated by discrimination."), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992) (describing remarks as "stray" when made "in the workplace by persons who are not involved in the pertinent decisionmaking process").

However, "[s]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Fletcher v. ABM Building Value*, 775 F. App'x 9, 13 (2d Cir. 2019) (quoting *Danzer v. Norden Sys., Inc*., 151 F.3d 50, 56 (2d Cir. 1998)). To determine whether a comment is probative of intent to discriminate or whether it is a non-probative "stray remark," a court considers the following factors:

> (1) who made the remark, i.e.[,] a decisionmaker, a supervisor, or a low-level co-worker; (2) whether the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process.

*Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 208 (D. Conn. 2012) (quoting *Schreiber*, 324 F. Supp. 2d at 518–19); *see also Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (applying the factors and noting that "[t]he district courts in this [C]ircuit have developed a standardized approach . . . [i]n determining whether a remark is probative." (citing, *inter alia*, *Schreiber*, 324 F. Supp. 2d at 518)); *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 489–90 (S.D.N.Y. 2017) (applying the factors to determine whether the plaintiff adequately alleged discriminatory animus on a motion to dismiss); *see also Silver v. North Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 363 (S.D.N.Y. 2007) ("An employer's discriminatory statements will rise above the level of stray remarks . . . when the statements are: (1) made by the decision maker or one whose recommendation is sought by the decision maker; (2) related to the specific

employment decision challenged; and (3) made close in time to the decision." (quoting *Rizzo v. Amerada Hess Corp.*, No. 99-CV-168, 2000 WL 1887533, at *5 (N.D.N.Y. Dec. 29, 2000)).

Plaintiff fails to establish a triable issue of fact as to whether an inference of discrimination can be drawn from the circumstances of Plaintiff's termination following the Section 75 Trial. As detailed above, Defendants served Plaintiff with three charges in anticipation of the Section 75 Trial: (1) abusive verbal conduct surrounding the July 9, 2013 incident with Turner as documented in the email correspondence between Brooklyn Property Management Department Director Marguerite Mann, Deputy Director Denise Brockington, Agbai and Turner (HR Letter ¶ 1; Emails dated July 15, 2013); (2) abusive verbal conduct toward Bazelais on May 1, 2013, as documented in the Counseling Memorandum dated May 2, 2013, (HR Letter ¶ 3; Counseling Mem. dated May 2, 2013); and (3) failure to perform his duties in a satisfactory manner as documented in the Counseling Memorandum dated July 2, 2013, (HR Letter ¶ 2; Counseling Mem. dated July 2, 2013). First, although Plaintiff argues in his opposition papers that "[t]he charges in support of [his] [G]eneral Trial were false, and based on . . . "being a [m]ale . . . person[] working as a Secretary [3]A in the Unity Plaza's Reception Office," (Pl.'s Counter 56.1 ¶ 16), he testified during deposition that the May 2, 2013 and July 2, 2013 Counseling Memoranda were not motivated by gender discrimination, (Pl.'s Dep. 243:3–20); *see Chevalier v. City of New York*, No. 18-CV-5048, 2020 WL 1891925, *3 (S.D.N.Y. Apr. 16, 2020) ("[A] party's . . . unsworn statement[] that contradicts his own prior deposition testimony 'should be disregarded on a motion for summary judgment.'" (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987))). Second, Plaintiff does not argue that the July 9, 2013 incident with Turner was motivated by gender discrimination but instead, contends more generally, that Turner learned she could "bully and harass [him] without any consequences" from

38

Bazelais, (Pl.'s Counter 56.1 ¶ 12), and that "Turner and [Agbai] lied in order to frame [him] for violence against women," (Am. Compl. ¶ 15), "so [Turner] could buy milk for her children," (Pl.'s Dep. 231:16–232:1).  Finally, Plaintiff does not dispute that Bazelais was on vacation during the July 9, 2013 incident with Turner or on July 16, 2013, when the Brooklyn Property Management Department prepared and submitted the request for the trial in Bazelais' name or that Bazelais only learned of the request for a trial when she returned from vacation.  (Defs.' 56.1 ¶ 12 (first citing Bazelais Decl. ¶ 5; then citing Request for Section 75 Trial dated July 16, 2013, annexed to Lippman Decl. as Ex. 18, Docket Entry No. 90-3).)  Nevertheless, Plaintiff argues that Bazelais "set in motion" the events that led to the July 9, 2013 incident with Turner, (Pl.'s Counter 56.1 ¶ 12), as part of her larger effort to "set [him] up to be fired" either because he was gay, HIV positive, or a man, (id. ¶ 7).

As Plaintiff offers only conclusory allegations in support of his claim that he was terminated following the Section 75 Trial on the basis of his gender, the Court grants Defendants' motion for summary judgment as to his termination claim.  *Holcomb*, 521 F.3d at 137 ("[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." (citing *Meiri*, 759 F.2d at 998)); *see also Gorzynski*, 596 F.3d at 101 ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment . . . and show more than some metaphysical doubt as to the material facts." (first citing *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 92 (2d Cir. 1992); and then quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

However, a reasonable jury could find that Bazelais' discriminatory remarks together with her conduct of assigning Plaintiff a disproportionately heavy workload and refusing to authorize overtime pay after requiring Plaintiff to work past the end of his shift while penalizing

39

him for not completing his other secretarial tasks in a timely fashion, give rise to an inference of gender discrimination. Bazelais' comment that "because [Plaintiff] is a man, he cannot do the job as good as a woman," and would have to stay overtime to complete additional tasks, (Pl.'s Dep. 74:14–17), amounts to more than a "stray remark," as Bazelais was responsible for authorizing overtime pay and her remarks could be interpreted by a jury to indicate that she denied Plaintiff compensation for his extra labor because in her view, he is incapable of performing his job because of his sex. *See Schreiber*, 324 F. Supp. 2d at 518 ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." (citing *Zhang v. Barr Labs., Inc.*, No. 98-CV-5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000) (collecting cases))); *see also Yang v. Dep't of Educ. of the City of N.Y.*, No. 14-CV-7037, 2016 WL 4028131, at *7–8 (E.D.N.Y. July 26, 2016) (finding that allegations of supervisor's frequent discriminatory comments were sufficient to give rise to an inference that discriminatory animus may have played a part in the plaintiff's termination even though it was "unclear precisely" when the comments were made).

Because Plaintiff fails to establish that the circumstances surrounding his termination give rise to an inference of discrimination, the Court only considers whether Defendants produce legitimate, non-discriminatory reasons for (1) the disproportionately heavy volume of Plaintiff's workload, and (2) Bazelais' failure to fully compensate Plaintiff for overtime hours he was required to work.

### 2. Legitimate, nondiscriminatory reason

Defendants do not address the disparity between Plaintiff's and Rodriguez's workload, but argue that he was only assigned tasks within the scope of his title and that there is no

"evidence that [Bazelais] failed to pay Plaintiff overtime on any occasion that she authorized his overtime — and her authorization was required for Plaintiff to work overtime, as she informed Plaintiff."  (Defs.' Mem. 3.)  With regard to overtime pay, Defendants argue that Plaintiff's testimony regarding Bazelais' refusal to authorize overtime pay is contradicted by "Bazelais' testimony that 'every time' she required Plaintiff to work overtime, he got paid."  (Defs.' Reply 7 (citing Bazelais Dep. 46:16–47:6).)

Because Defendants fail to provide a nondiscriminatory reason for the volume of Plaintiff's workload, the Court denies summary judgment with respect to this adverse action. *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 692–93, 692 n.10 (S.D.N.Y. 2011) (denying defendant's motion for summary judgment in light of "the material issues of fact as to whether discrimination was a factor" in the adverse employment action and because "defendants did not offer legitimate, non-discriminatory reason" for the alleged adverse action, relying instead on their argument that defendants' actions "were not adverse employment actions"); *Cf. Wallen v. Teknavo Grp.*, No. 12-CV-6196, 2019 WL 1435879, at *23 (E.D.N.Y. Mar. 30, 2019) (finding that "[b]ecause [d]efendant fails to provide any legitimate, non-retaliatory rationale for the alleged [adverse action] the [c]ourt finds that summary judgment is inappropriate for this claim").

Defendants have proffered a non-discriminatory reason for Bazelais' failure to authorize overtime and the Court therefore considers whether Plaintiff has shown that these reasons are pretextual.

### 3.   Pretext

Plaintiff alleges that "[he] worked overtime when [he] was asked to work overtime," but that Bazelais refused to pay him for discriminatory reasons based on his gender.  (Pl.'s Counter 56.1 ¶¶ 55, 58.)

A plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (quoting *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Doe v. Bd. of Educ. of Fallsburgh Cent. Sch. Dist.*, 63 F. App'x 46, 49–50 (2d Cir. 2003) ("Evidence that could permit a jury to believe that the defendant's proffered reasons are not believable can support an inference that they are pretexts for discrimination." (citing *Reeves*, 530 U.S. at 147)); *Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) ("From . . . 'implausibilities, inconsistencies, [and] contradictions in' the proffered reasons . . . one 'could conclude that . . . explanations [are] pretext.'" (first alteration in original) (quoting *Zann Kwan*, 737 F.3d at 846)).

Because Plaintiff testified that Bazelais gave him excessive work but refused to authorize overtime pay because of his gender, (Pl.'s Dep. 73:10-74:3), a reasonable jury could find that Defendants' proffered reason for the nature of the work assignment or for denying overtime pay — that Plaintiff failed to obtain the advance required authorization — is pretext.  There is a

disputed issue of fact as to whether Bazelais required Plaintiff to work overtime, but then refused to authorize compensation for the full overtime period because of his gender.

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's Title VII and NYSHRL discrimination claims based on Defendants' assignment of a disproportionately heavy workload and failure to authorize Plaintiff's compensation for overtime but grants the motion as to the assignment of non-secretarial work, issuance of counseling and instructional memoranda and Plaintiff's termination.

### ii. NYSHRL disability discrimination claim

Defendants argue that Plaintiff cannot establish a claim of disability discrimination in violation of the NYSHRL as Plaintiff has not demonstrated that Bazelais or Traficante were aware of his HIV status prior to the lawsuit, (Defs.' Mem. 21), and that "Plaintiff's claim regarding his inability to use the kitchen sink and dish rack is unsupported by the evidence," (*id.* at 20).[19] Defendants further contend that there is no evidence to support Plaintiff's claim that

---

[19] In support, Defendants argue that "[a]ll witnesses questioned about this topic denied that Plaintiff was forbidden from using the kitchen sink and rack — and Housing Assistant Shaunte Williams specifically remembered Plaintiff using the kitchen sink and never saw dishes in the broom closet next to the kitchen sink, where Plaintiff claims he dried his dishes." (Defs.' Mem. 21 (citation omitted).) A moving party generally cannot prevail on a motion for summary judgment where there is conflicting testimony. When a district court is faced with "the contradictory deposition testimony of a fact witness . . . , the general rule remains that a district court may not discredit a witness's deposition testimony [or declaration] on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 246 (2d Cir. 2020) (alteration in original) (quoting *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) (per curiam)). "Assessments of credibility and choices between conflicting versions of . . . events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996)); *see also Hayes v. N.Y.C.Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

"Chu denied him a request for leave of absence, marked him AWOL, or did not pay him for absences when he had sufficient accrued leave time."  (Defs.' Reply 10.)

Plaintiff maintains that "Bazelais knew of [his] illness because [he] had to tell her [when he] had to submit [his] [l]eave of [a]bsence forms to [Rodriguez]," and that he also told Bazelais that "he took HIV medication."  (Pl.'s Counter 56.1 ¶¶ 77, 81; *see also* Pl.'s Dep. 148:13–18, 151:18–23.)  Plaintiff testified that after he disclosed his medical condition to Bazelais, she prohibited him from using "the sink, rack, or the kitchen cabinet" because of his HIV status. (Pl.'s Counter 56.1 ¶ 80; *see also* Pl.'s Dep. 154:4–11; Pl.'s Aff. ¶ 7.)  With regard to his experience at Garvey Plaza, where Plaintiff was employed from August 14, 2013 through April 1, 2014, (*see* Defs.' 56.1 ¶¶ 14, 126), he argues that on February 19, 2014, Chu wrongly marked him absent and did not pay him for his time, even though he was "very sick that morning" due to medical complications caused by HIV and "called the office before the deadline and spoke to [Marcus Garvey Superintendent Omar] Ortiz."[20]  (Pl.'s 56.1 ¶ 124 (citing Dep. of Omar Ortiz "Ortiz Dep" 9:16–17:28, annexed to Pl.'s Opp'n as Ex. 8, Docket Entry No. 95-6); *see also* Pl.'s Dep. 161:6–23.)

HIV qualifies as a disability under the ADA.  *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ("HIV infection is a disability under the [ADA]." (citing *Bragdon v. Abbott*, 524 U.S. 624, 639–45 (1998))).  Claims of disability-based discrimination under the NYSHRL are analyzed under the same standard as claims of discrimination under the ADA and are governed by the *McDonnell Douglas* burden-shifting framework discussed above.  *See Baron v. Advances Asset and Prop. Mgmt. Sols. LLC*, 15 F. Supp. 3d 274, 281 (E.D.N.Y. 2014) (citing *Weinstock*,

---

[20] On February 21, 2014, Chu, Plaintiff's supervisor at Garvey Plaza issued a counseling memorandum to Plaintiff for his failure to follow leave of absence procedures even after receiving a verbal warning.  (Counseling Mem. dated Feb. 21, 2014.)

224 F.3d at 42 n.1); *Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 507–08 (2d Cir. 2020) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004))); *Hyek*, 461 F. App'x at 60 ("Claims brought under the NYSHRL 'are analyzed identically' [to Title VII claims] and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith*, 196 F.3d at 363 n.1)); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 n.3 (2d Cir. 2001) ("[T]he analysis under the state law parallels that used in the ADA context." (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 n.1 (2d Cir. 2000))).  To establish a prima facie case of disability discrimination under the NYSHRL, the plaintiff must show that: (1) he suffers from a disability; and (2) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability.  *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 18 (2d Cir. 2017) (quoting *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015)); *see also Miloscia v. B.R. Guest Holdings LLC*, 928 N.Y.S.2d 905, 912 (N.Y. Sup. Ct. 2011) ("To establish a case of disability discrimination, a plaintiff must show that he or she suffers from a disability, and the disability caused the behavior for which he or she was terminated." (citing *McEniry v. Landi*, 620 N.Y.2d 328, 330 (1994))); *see also Miceli*, 830 F. App'x at 64–65 (same).  The third element, causation, necessarily incorporates an inquiry as to whether the employer had notice of the plaintiff's disability.  *See, e.g.*, *Pacenza v. IBM Corp.*, No. 04-CV-5831, 2009 WL 890060, at *10 (S.D.N.Y. Apr. 2, 2009) (finding that because the employer lacked knowledge of plaintiff's alleged disability, the plaintiff failed to demonstrate causation, since "if [an employer was] truly unaware that . . . a disability existed, it would be

impossible for [an] [employment] decision to have been based, even in part, on respondent's disability" (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55, n.7 (2003)), *aff'd*, 363 F. App'x 128 (2d Cir. 2010); *see also Watson v. Arts & Ent. Television Network*, No. 04-CV-1932, 2008 WL 793596, at *10 (S.D.N.Y. Mar. 26, 2008) ("[N]otice to the employer of the claimed disability is an essential element of a wrongful termination case under the ADA."), *aff'd*, 352 F. App'x 475 (2d Cir. 2009).

### 1.   Prima facie case

The parties do not dispute that Plaintiff suffers from a disability and was otherwise qualified to perform the job.  However, Defendants argue that Bazelais had no knowledge that Plaintiff was HIV positive and therefore, suffered from a disability until after he commenced this litigation.  (Defs.' Mem. 21.)  Defendants do not address Plaintiff's claim that Chu was aware of Plaintiff's HIV status during his employment at Garvey Plaza.  (*See generally id.*; *see generally* Defs.' Reply.)  In addition, Defendants dispute that Plaintiff suffered any adverse employment action as a result of his disability.  (*Id.* at 22.)

The Court therefore considers whether Plaintiff has (1) established Defendants were aware of his HIV status and (2) that he suffered adverse actions (a) based on Bazelais' alleged denial of access to the workplace kitchen because of his disability, and (b) through Chu's denial of his requested leave of absence due to his disability.

### A.   Defendants' knowledge of Plaintiff's disability

Although Bazelais testified that she was not aware of Plaintiff's HIV status, (*see* Bazelais Dep. 97:9–17), Plaintiff testified that Bazelais was aware of his disability because he disclosed the information to her when he submitted his leave of absence forms to her secretary and when he told her that "he took HIV medication," (Pl.'s Counter 56.1 ¶¶ 77, 81; *see also* Pl.'s Dep.

46

148:13–18, 151:18–23).  Plaintiff argues that Chu was likewise aware of his HIV positive status as "Chu and [Bazelais] spoke regularly before [he] was transferred" to Marcus Garvey Plaza. (Pl.'s Aff. ¶ 48.)

Based on the parties' conflicting testimony and Plaintiff's sworn statement, a reasonable jury could credit Plaintiff's testimony and find that both Bazelais and Chu, and therefore NYCHA, knew of Plaintiff's disability.  *See Lewis v. Blackman Plumbing Supply LLC*, 51 F. Supp. 3d 289, 307 n.9 (S.D.N.Y. 2014) (finding that the "[supervisor's] knowledge of [p]laintiff's disability was sufficient to provide notice to [d]efendants for purposes of ADA liability" (first citing *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008); and then citing *Alexiadis v. N.Y. Coll. of Health Pros.*, 891 F. Supp. 2d 418, 430 n.10 (E.D.N.Y. 2012))).

### B.   Adverse actions

#### (1)   Access to kitchen sink and drying rack

Plaintiff argues that because Bazelais denied him access to the "kitchen sink and kitchen rack, because of [his] HIV-positive status," he was "[forced] to use the bathroom to wash [his] hands and dishes before and after meals [which] was humiliating and took up a lot of time from [his] lunch hour."  (Pl.'s Aff. ¶ 26; Pl.'s Dep. 154:4–11.)  In addition, Plaintiff contends that the superintendent bathroom "was rarely cleaned since it was only intended to be used by the superintendent and the occasional maintenance worker," (Pl.'s Aff. ¶ 30), and that "[b]ecause the back bathroom was infrequently cleaned, it often had no paper towels" for Plaintiff to use to dry his dishes, (*id.* ¶ 32).

"To be adverse, an employment action must involve the deprivation of 'some "tangible job benefits" such as "compensation, terms, conditions or privileges" of employment.'"  *Signer v. Tuffey*, 66 F. App'x 232, 235 (2d Cir. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d

Cir. 2002). "An actionable adverse employment action is a '"materially adverse change" in the terms and conditions of employment.' 'Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Kairam v. West Side GI, LLC*, 793 F. App'x 23, 27 (2d Cir. 2019) (first quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007); and then quoting *Vega*, 801 F.3d at 85).

The Court finds that a reasonable jury could conclude that the stigmatizing impact of denying Plaintiff access to the workplace kitchen based on his HIV-positive status, materially altered the conditions of Plaintiff's employment for the worse, and that Plaintiff therefore establishes a prima facie case of discrimination on the basis of disability.[21] *Cf. Rodríguez-*

---

[21] This case is distinguishable from cases where courts have found restrictions on an employee's access to facilities did not rise to adverse action. *See, e.g., Saborit v. Harlem Hosp. Cnt. Auxiliary, Inc.*, 19-CV-4686, 2021 WL 2709411, at *19 (S.D.N.Y. July 1, 2021) (denying HIV positive plaintiff's disability discrimination claim based on supervisor's instruction "that [p]laintiff not use her private bathroom" but "use the bathroom on the fourth floor because it was a public floor that would be cleaned more regularly" because the request "did not alter the terms and conditions of [the] [p]laintiff's employment"); *Gasperini v. Dominion Energy New Eng., Inc.*, No. 10-CV-11246, 2012 WL 2402804, at *11 (D. Mass. June 25, 2012) (plaintiff's "discomfort with the facilities, without more, does not constitute an adverse employment action" for the purposes of a gender discrimination claim (citing *Macklin v. Am. Sugar Refin., Inc.*, No. 06-CV-2467, 2007 WL 2815984, at *1 (D. Md. Sept. 26, 2007))); *Macklin*, 2007 WL 2815984, at *1 (finding that plaintiff's claim that she "does not like to use that bathroom because she believes it to be 'substandard and unclean' . . . does not establish disparate treatment"). Unlike these cases, in the instant case, a reasonable jury could conclude that the restriction on Plaintiff's access to the shared workplace kitchen was part of a course of discriminatory conduct sufficiently malicious and stigmatizing that it constituted an adverse action; such conduct included making "biweekly" derogatory comments about "people with HIV" in front of Plaintiff, including that "gay people 'deserve AIDS'" and that "when a gay man dies from AIDS-related causes 'it's [their] fault because [he had] sex with men.'" (Pl.'s Aff. ¶¶ 20–22.) *Cf. Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("Material adversity is to be determined objectively, based on the reactions of a reasonable employee. 'Context matters,' as some actions may take on more or less significance depending on the context. Alleged acts of

*Álvarez v. Díaz*, No. 14-CV-1924, 2017 WL 666052, at *3 (D.P.R. Feb. 17, 2017) (denying

defendant's motion for summary judgment as to plaintiff's ADA hostile work environment

based, *inter alia*, on testimony that after plaintiff's HIV positive diagnosis became public

defendants "closed the bathroom and kitchenette within the department," requiring plaintiff to

"to walk five to ten minutes to bathrooms on the other side of the [building]").

Defendants do not offer any legitimate, nondiscriminatory reason for denying Plaintiff

access to the kitchen, but instead deny the underlying factual allegation. Thus, there is a

disputed issue of material fact regarding Plaintiff's treatment at Unity Plaza based on his HIV-

positive status and the Court therefore denies summary judgment as to Plaintiff's claim that he

endured disability-based discrimination in violation of the NYSHRL while employed at Unity

Plaza.

### (2)   Denial of requested leave of absence

As detailed above, Plaintiff argues that Chu denied his leave request due to his qualifying

medical condition, "cost[ing] [him] a day's pay and a lot of anxiety." (Pl.'s Aff. ¶ 55.) In

support, Plaintiff testified that he was denied a request for a leave of absence one morning when

"he woke up sick" as a result of complications stemming from his HIV-positive status and was

unable to get Chu on the phone to request leave. (Pl.'s Dep. 161:12–14.) Plaintiff spoke to

superintendent Omar Ortiz who was likewise unable to reach Chu and "when [Plaintiff] came in

the next day, she wrote [him] up for being AWOL, because [he] did not speak to her." (*Id.* at

161:16–18; Pl.'s Aff. ¶ 5.) Ortiz testified that although he did not recall Plaintiff calling in sick

on the day in question, "if [Plaintiff] did call or [Ortiz] couldn't get in touch with [Chu, Ortiz]

---

retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take
on greater significance when they are viewed as part of a larger course of conduct." (first citing
*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69–70 (2006); and then citing *Hicks v.
Baines*, 593 F.3d 159, 165 (2d Cir. 2010))).

would take the phone call because [he]" is "the next supervisor in line," and that if Plaintiff had informed Ortiz that he was unable to come to work "it's just like letting [Chu] know because when [Ortiz] see[s] her [he] would let her know that [Plaintiff was] not coming in and that [he] spoke to somebody."  (Ortiz Dep. 12:17–13:22, 13:24–14:6.)

Based on Plaintiff's testimony that Defendants denied him compensation as a result of Chu's refusal to acknowledge his request for a leave of absence due to his disability, a reasonable jury could find that he suffered an adverse action.  *See Horsham v. Fresh Direct*, 136 F. Supp. 3d 253, 263–64 (E.D.N.Y. 2015) ("Placing an employee on unpaid leave can constitute an adverse employment action."); *see also St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 318 (E.D.N.Y. 2014) (noting that "in the discrimination context courts find that being required to take unpaid leave can be an adverse employment action"); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 583 (S.D.N.Y.2008) ("Being placed on unpaid leave and termination of employment constitute adverse employment actions." (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

### 2.   Legitimate, nondiscriminatory reason

Defendants argue that Plaintiff was compensated during his absence, because "Plaintiff's payroll records indicate Plaintiff was paid every day he worked at Marcus Garvey — and he was not paid for one day when he was absent, [as he] had insufficient accrued leave time to cover the absence, and was [therefore] marked leave without pay."  (Defs.' Reply 10 (citing Defs.' 56.1 ¶ 124); *see also* Payroll Records, annexed to Lippman Decl. as Ex. 33, Docket Entry No. 90-

3).)[22]  As Defendants have proffered a legitimate, nondiscriminatory reason for denying

Plaintiff's compensation, the Court considers whether Plaintiff can show pretext.

### 3.    Pretext

Plaintiff argues that Defendants' proffered legitimate, nondiscriminatory reason is pretext

because "[he] left NYCHA with owed accrued leave," but concedes he does not "know if

accrued leave and [s]ick [l]eave [are] the same [thing]."  (Pl.'s Counter 56.1 ¶ 124.)

At the summary judgment stage, because the Court must "resolve all ambiguities and

draw[] all inferences in favor of the non-moving party," *Pinto*, 221 F.3d at 398, the Court finds

that Plaintiff has sufficiently proffered evidence from which a jury could find that Defendants'

proffered legitimate, nondiscriminatory reason is pretext for discriminatory intent as Plaintiff

claims to have left NYCHA with accrued leave, contrary to Defendants' claim that he was

denied leave because he had insufficient accrued leave.  The Court therefore denies Defendants'

motion for summary judgment as to Plaintiff's claim of disability discrimination at Garvey Plaza

based on the denial of a leave of absence due to his disability.

### c.    Hostile work environment claims

Plaintiff asserts that he endured a hostile work environment based on (1) his gender in

violation of Title VII, the NYSHRL, and the NYCHRL (*see* Am. Compl.); (2) his sexual

orientation in violation of the NYSHRL and NYCHRL, (*see* Pl.'s Aff); and (3) his disability in

violation of the NYSHRL and NYCHRL, (*see id.*).  The Court discusses each category below.

---

[22]  Although the record supports Defendants' claim that Plaintiff was marked "LWOP" on March 3, 2014, (Payroll Records), the record does not indicate whether Plaintiff had accrued leave time sufficient to cover the absence.

### i. Title VII and NYSHRL hostile work environment claims based on gender discrimination

Defendants argue that "Plaintiff cannot show severe and pervasive gender discrimination in his work environment so as to satisfy the legal standard," (Defs.' Mem. 14), because: (1) "the [t]rial [o]fficer's finding that Plaintiff had access to a portable air conditioner must be given preclusive effect," and "[t]here is no law to support an argument that use of a portable air conditioner rather than a window air conditioner creates a hostile work environment," (*id.* at 12); and (2) Plaintiff's "own unprofessional behavior with his coworkers and Unity Plaza tenants necessitated the intervention of supervisors and caused conflicts in the office," (*id.* at 14).

Plaintiff argues that Bazelais created a hostile work environment at NYCHA through persistent harassment on the basis of his sex and alleges that the following acts and conditions contributed to the hostile work environment: (1) in contrast to the female secretary's office, Plaintiff's office did not have a window or air conditioning, (Pl.'s Dep. 126:3–4; Am. Compl. ¶ 13), and when Plaintiff "filed a work order ticket to have someone . . . put in an air conditioner, [Bazelais] had the request removed from the system," (Am. Compl. ¶ 28); (2) "on numerous occasions, [Harvey] screamed at [Plaintiff] repeatedly and tried to provoke arguments," (Pl.'s Dep. 127:7–9); (3) "on several occasions," Bazelais commented that as a man, Plaintiff was not suited for his job because it was a "woman's job," (Am. Compl. ¶ 24; *see also* Pl.'s Dep. 74:14–17); and (4) Bazelais would require Plaintiff to "work [overtime], but then would refuse to authorize the overtime pay, claiming that [he] was not doing [his] work when [he] was actually working overtime," (Am. Compl. ¶ 29; *see also* Pl.'s Dep. 73:16–25), causing him to appear incompetent, (Am. Compl. ¶ 81).

To establish a Title VII hostile work environment claim, a plaintiff must "show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive
working environment.'" *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018)
(alteration in original) (quoting *Gorzynski*, 596 F.3d at 102); *Littlejohn*, 795 F.3d at 320–21
(quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993)).  "The same standards [as are
applied to Title VII] apply to the plaintiffs' hostile environment claims arising under the
NYSHRL . . . ." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir.
2014); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work
environment claims under both [federal law] and the NYSHRL are governed by the same
standard." (citing *Schiano*, 445 F.3d at 609)).  "This standard has both objective and subjective
components: the conduct complained of must be severe or pervasive enough that a reasonable
person would find it hostile or abusive, and the victim must subjectively perceive the work
environment to be abusive." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019)
(quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).  A plaintiff must also show
"that the complained of conduct . . . creates such an environment because of the plaintiff's"
protected characteristic.  *LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 782 (2d Cir.
2019) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  The Second Circuit has
cautioned that:

> [W]hile the standard for establishing a hostile work environment is
> high, we have repeatedly cautioned against setting the bar too high,
> noting that [w]hile a mild, isolated incident does not make a work
> environment hostile, the test is whether "the harassment is of such
> quality or quantity that a reasonable employee would find the
> conditions of her employment *altered for the worse*.

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (alteration in original) (quoting *Whidbee v.
Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).  A court should consider the
totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (quoting *Littlejohn*, 795 F.3d at 320–21); *Patane*, 508 F.3d at 113.  In evaluating whether a plaintiff has established a hostile work environment claim, the court must consider facially neutral conduct that might "bolster a harassment claim" when the facially neutral conduct is by the same individual who engaged in "overt[]" discrimination.  *See Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, 3 (2d Cir. 2017) (quoting *Kaytor*, 609 F.3d at 547–48) (remanding with instructions to the district court to consider facially neutral incidents of harassment in analyzing the plaintiff's hostile work environment claim).

Unlike Title VII, individuals may be held liable under the NYSHRL.  *See Antoine v. Brooklyn Maids 26, Inc*., 489 F. Supp. 3d 68, 89 (E.D.N.Y. 2020) ("An individual may be held liable under the NYSHRL where . . . [she] is a supervisor that can make hiring and firing decisions." (citing *EEOC v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014))); *Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015) ("[U]nlike federal law, New York state law permits individual liability." (citing *Feingold*, 366 F.3d at 158)); *see also Suffolk Laundry Servs., Inc*., 48 F. Supp. 3d at 523 (stating that "[t]he NYSHRL allows for individual liability under two theories: . . . if the defendant has 'an ownership interest' in the employer or 'has the authority to hire and fire employees'" (first quoting *Tomka v. Seiler Corp*., 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998)); and then citing N.Y. Exec. Law § 296(1))).  As the NYSHRL renders it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [§ 296], or attempt to do so," the Second

Circuit has held that "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' [may] be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold*, 366 F.3d at 158 (first quoting N.Y. Exec. Law § 296(6), and then quoting *Tomka*, 66 F.3d at 1317). In addition, "[a] supervisor is [considered] an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor 'actually participates in the conduct giving rise to [the] discrimination.'" *Id.* at 158 (citing *Tomka*, 66 F.3d at 1317).

To hold an employer liable for a hostile work environment under Title VII, "federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Bentley*, 935 F.3d at 90 (quoting *Summa*, 708 F.3d at 124). "Two such bases exist: strict vicarious liability if an employer's supervisor has created the hostile environment; and negligence if a co-worker who is not a supervisor has created the environment, and the employer, upon becoming aware of the misconduct fails to remedy it." *Id.* (first citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); and then citing *Summa*, 708 F.3d at 124); *see also Antoine*, 489 F. Supp. 3d at 87 ("An employer . . . can be held vicariously liable under Title VII for the unlawful conduct of supervisors with the capacity to take 'tangible employment actions.'" (quoting *Setty v. Fitness*, No. 17-CV-6504, 2018 WL 8415414, at *7 (E.D.N.Y. Dec. 18, 2018), *report and recommendation adopted sub nom.*, *Setty v. Synergy Fitness*, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019))). "[A]n employee is a supervisor only 'when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits."'" *Bentley*, 935 F.3d at 91 (quoting *Vance v. Ball State University*, 570 U.S. 421, 431 (2013)).

In contrast, "a typical private employer could not be held liable under the [NYSHRL] for an employee's discriminatory act 'unless the employer became a party to it by encouraging, condoning, or approving it.'" *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 455 (2001); *see also Antoine*, 489 F. Supp. 3d at 88 ("Under the NYSHRL '[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'" (alteration in original) (quoting *Romero v. City of N.Y.*, 839 F. Supp. 2d 588, 635 (E.D.N.Y. 2012)). However, a supervisor's conduct is generally imputed to the employer under the NYSHRL. *See McCalla v. City of New York*, No. 15-CV-8002, 2017 WL 3601182, at * 44 (S.D.N.Y. 2017) (finding that the "plaintiffs establish[ed] liability against the City for their NYSHRL and NYCHRL claims by showing that the alleged discriminatory conduct was perpetrated by a supervisor" (citing *Swiderski v. Urban Outfitters, Inc.*, No. 14-CV-6307, 2015 WL 3513088, at *5 (S.D.N.Y. June 4, 2015), *report and recommendation adopted*, 2017 WL 4277182, (E.D.N.Y. Sept. 22, 2017))).

The Court finds that a reasonable jury could credit Plaintiff's claim that Bazelais fostered an abusive environment throughout his three years and eleven months tenure at Unity Plaza by: (1) regularly making derogatory remarks about Plaintiff's gender; and (2) assigning a disproportionately heavy workload and requiring Plaintiff to work overtime hours to complete the work while denying overtime compensation because he was a man.[23]

---

[23]   The Court finds that Plaintiff is precluded from relitigating whether he was denied access to air-conditioning based on his gender as the trial officer found that Plaintiff "could have pursued other avenues of relief for the lack of air conditioning such as having the portable air conditioner moved from the so called 'paint room' to the reception area, where he claimed it

With respect to Bazelais' discriminatory remarks, Plaintiff testified that she repeatedly told him that "because [he is] a man, [he] cannot do the job as good as a woman," (Pl.'s Dep. 74:14–17), that "a woman could do [his] work faster and better than [he] did," (*id.* at 71:20–21), and that "[he] did not belong there [because he] was a man doing woman's work," (*id.* at 110:9–11). In addition, Plaintiff testified that Bazelais assigned him a disproportionately heavy workload and required Plaintiff to work overtime hours to complete the work while denying overtime compensation because he was a man. (*Id.* at 74:14–23.) The Court therefore finds that Plaintiff has established a triable issue of fact as to whether he endured a hostile work environment because of his gender. *See Espinosa v. Weill Cornell Med. Coll.*, No. 18-CV-11665, 2021 WL 1062592, at *9 (S.D.N.Y. Mar. 19, 2021) (denying summary judgment to defendant on hostile work environment claim where plaintiff presented evidence that "on many occasions" her supervisor "screamed, banged his hands on the table, and used a patronizing voice, more towards her more than the rest of the team," and that the "'three years of belittling and degrading' behavior [plaintiff] describes, shows that the allegedly unwarranted abuse she was subjected to was severe and permeated her workplace"); *Yang*, 2016 WL 4028131, at *10 (finding that the plaintiff's supervisor had acted in ways "calculated to interfere" with her work as a school psychologist by making frequent derogatory comments about the plaintiff's accent, writing biased performance evaluations, moving her office to a location that made it more difficult to complete her tasks, and assigning her a disproportionately heavy and difficult workload).

---

ended up anyway on the day he was suspended." (NYCHA R&R 176); *see Gonzalez v. City of New York*, 845 F. App'x 11, 17 (2d Cir. 2021) ("The *factual* findings [in a Section 75 hearing] supporting the hearing officer's ultimate conclusion — that [plaintiff] had indeed committed the charged conduct . . . precluded [plaintiff] from arguing otherwise at trial." (first alteration in the original) (quoting *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 49 (2d Cir. 2014))).

Accordingly, a reasonable jury could find NYCHA liable for creating a hostile work environment under Title VII and the NYSHRL, based on the severity and pervasiveness of the harassment and the fact that Bazelais engaged in the harassing conduct and was Plaintiff's supervisor. *See Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d at 511 ("Where the harasser is a supervisor, an individual 'empowered to take tangible employment actions against the victim,' and 'the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.'" (quoting *Vance*, 570 U.S. 424)).  In addition, there is sufficient evidence to permit a reasonable jury to find Bazelais individually liable for any violation of the NYSHRL either (1) as an employer based on her authority "do more than carry out personnel decisions made by others," *Peck v. County of Onondaga*, No. 21-CV-651, 2021 WL 3710546, at *15 (N.D.N.Y. Aug. 20, 2021) (quoting *Townsend v. Benjamin Enters., Inc*., 679 F.3d 41, 57 (2d Cir. 2012)), or (2) as an aider and abettor to the employer's discrimination, *see id.* ("[A] co-worker can be held personally liable as an aider and abettor 'if they [personally] participate in the conduct giving rise to a discrimination claim.'  Counterintuitive as it may seem, a coworker who by all accounts is the sole source of discriminatory misconduct is still culpable not as a principal, but as an aider and abettor." (first quoting *Feingold*, 366 F.3d at 158-59; and then citing *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012))); *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 74 (S.D.N.Y. 2020) (noting that the principle announced by the Second Circuit in *Tomka v. Seiler Corporation*, 66 F.3d 1295 (2d Cir. 1995), "permits a principal violator also to be found liable as an aider and abettor provided that the employer is found to have participated in the violation" despite "the capacity of the holding in *Tomka* to yield circular results, in situations where the factual basis for the employer's liability was exclusively the conduct of the employee-defendant sought to be held liable as an aider and abettor"))).

The Court therefore denies Defendants' motion for summary judgment as to Plaintiff's Title VII and NYSHRL gender-based hostile work environment claims.

> ### ii. NYSHRL hostile work environment claim based on sexual orientation discrimination

Defendants argue that Plaintiff cannot establish that he endured a hostile work environment based on his sexual orientation because Plaintiff testified that the homophobic comments did not affect his job, the comments were not directed towards him, and he did not take the comments personally.  (Defs.' Mem. 4.)

Plaintiff contends that "twice a week" Bazelais and his coworkers would congregate by his desk to make homophobic remarks (Pl.'s Aff. ¶¶ 8, 17, 20; *see also* Pl.'s Dep. 156:24–157:5), and that on one occasion, while he was telling Agbai, Bazelais, and Harvey that their homophobic jokes and commentary were offensive, "[a]n elevator maintenance person also walked in on that happening and . . . told them to stop," (*id.* 61:14–18).  Plaintiff alleges that by participating in offensive conversations, Bazelais gave permission to others in the office to abuse Plaintiff, including Turner who adopted "[t]he same pattern[] Bazelais taught her," by mistreating Plaintiff and then "l[ying] that [Plaintiff] attacked her and claim[ing] she was afraid of [Plaintiff]."  (Pl.'s Aff. ¶ 12.)  For the approximately one and a half years that Bazelais supervised Plaintiff, Plaintiff testified that Bazelais and others engaged in this behavior twice a week during his entire work experience at Unity Plaza.  (*See* Defs.' 56.1 ¶¶ 2, 14; Pl.'s Dep. 220:22–221:1.)

In light of the frequent and enduring nature of this conduct, and the conduct itself, a reasonable jury could find that Bazelais created an objectively hostile work environment due to Plaintiff's sexual orientation.  *See James v. Van Blarcum*, 782 F. App'x 83, 85 (2d Cir. 2019) ("[W]hether racial slurs constitute a hostile work environment typically depends upon the

quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a

realistic view of the work environment." (alteration in original) (quoting *Schwapp v. Town of

Avon*, 118 F.3d 106, 111 (2d Cir. 1997))); *Bonilla v. City of New* York, No. 18-CV-12142, 2019

WL 6050757, *16 (S.D.N.Y. Nov. 15, 2019) ("[Plaintiff's] claim does not rest on an isolated

incident or stray remarks, but on a pattern of abusive activity of a quality and quantity that a

reasonable employee would find worsened the conditions of his employment." (citing *Dawson v.

County of Westchester*, 373 F.3d 265, 274 (2d Cir. 2004))); *Marshall v. Kingsborough Cmty.

Coll. of CUNY*, No. 11-CV-2686, 2015 WL 5773748, at *11, (E.D.N.Y. July 27, 2015)

(concluding that given the "the inflammatory and clearly gender-based nature" of the department

chair's references to plaintiff and "other female employees" in derogatory terms and statements

that "women don't belong in the work place" together with the chair's conduct of "weekly

'g[etting] in the face' of female colleagues in a physically intimidating manner," "a reasonable

jury could conclude that the weekly or even twice-monthly slurs were sufficient to create a

hostile work environment"), *report and recommendation adopted in relevant part*, 2015 WL

5774269 (E.D.N.Y. Sept. 30, 2015); *Marino v. EGS Elec. Grp., LLC*, No. 12-CV-518, 2014 WL

1289453, at *9 (D. Conn. Mar. 31, 2014) (denying summary judgment as to hostile work

environment claim where "the record show[ed] that [the plaintiff] suffered from severe and

pervasive harassment from [a coworker] for over a year"); *see also Nichols v. Azteca Rest.

Enters., Inc.*, 256 F.3d 864, 873 (9th Cir. 2001) (holding "that a reasonable man would have

found the sustained campaign of [homophobic] taunts, directed at [plaintiff] and designed to

humiliate and anger him, sufficiently severe and pervasive to alter the terms and conditions of his

employment").  As discussed above, because Bazelais was Plaintiff's supervisor, her conduct is

imputed to NYCHA under the NYSHRL.  *See, e.g., Rosas v. Balter Sales Co. Inc.*, No. 12-CV-

60

6557, 2018 WL 3199253, at *5 n.5 (S.D.N.Y. June 29, 2018) ("Under the NYSHRL and the

NYCHRL, an employer can be liable for discriminatory conduct where an employee who

engaged in unlawful conduct exercised managerial or supervisory responsibility." (citing

*Townsend*, 679 F.3d at 57)); *see also McCalla*, 2017 WL 3601182, at *44 (finding "plaintiffs

establish liability against the City for their NYSHRL and NYCHRL claims by showing that the

alleged discriminatory conduct was perpetrated by a supervisor").

With respect to Defendants' argument that Plaintiff cannot establish that the conduct was

subjectively offensive because he testified that he did not take the homophobic conduct

personally, (Defs.' Mem. 4), the Court finds that Plaintiff's testimony that he "could not take

[these homophobic comments] personally . . . [b]ecause [he] would be fighting half the people in

the United States and half of the people in [his] personal life," (Pl.'s Dep. 103:12–16), is not

inconsistent with Plaintiff subjectively experiencing the comments as offensive and hostile, as an

individual may recognize that they are not being targeted personally, but categorically, as a result

of a protected characteristic, and still be profoundly offended by the treatment, (*see, e.g.*, *id.* at

156:12–16 (stating that his coworkers frequently gathered around his desk to make homophobic

comments with the intent to "harass [him] and humiliate [him] and try and provoke some

response from him"); Pl.'s Aff. ¶ 19 ("Although [he] felt these conversations to be incredibly

offensive, hurtful, anxiety-inducing, angering, and traumatic, [he] suppressed [his] feelings and

tried not to visibly react.")).

Accordingly, the Court denies Defendants' motion for summary judgment as to

Plaintiff's hostile work environment claim under the NYSHRL based on his sexual orientation.

### iii.  NYSHRL hostile work environment based on disability discrimination

Because Plaintiff alleges distinct facts in support of his disability-based hostile work environment claims based on conduct at Unity Plaza and Garvey Plaza respectively, the Court separately discusses Plaintiff's claims regarding each location.

### 1.  Unity Plaza

Defendants argue that Plaintiff cannot establish that he suffered a hostile work environment based on his disability at Unity Plaza because: (1) "Plaintiff's claim that [Bazelais] did not permit him to use the kitchen sink or dish rack due to his HIV positive status is contradicted by the testimony of the witnesses Plaintiff deposed — who uniformly denied he was forbidden from using the sink or dish rack," (Defs.' Mem. 4); and (2) "Plaintiff [has not] established that anyone at Unity Plaza knew of his HIV positive status prior to this litigation," (*id*.).

Plaintiff argues that he has established a claim because Bazelais knew of his HIV-positive status and told him not to use the kitchen sink and dishrack because of this status.  (Pl.'s Dep. 148:13–18, 151:18–23; 154:4–11, 174:18–21.)

As detailed above, Plaintiff testified that Bazelais was notified of his disability when he submitted his leave of absence forms to her secretary and also when he told Bazelais that "he took HIV medication."  (Pl.'s Counter 56.1 ¶¶ 77, 81; *see also* Pl.'s Dep. 148:13–18, 151:18–23.)  Plaintiff also testified that Bazelais denied him access to the "kitchen sink and kitchen rack, because of [his] HIV-positive status," and forced him "to use the bathroom to wash [his] hands and dishes before and after meals [which] was humiliating and took up a lot of time from [his] lunch hour."  (Pl.'s Aff. ¶ 26; Pl.'s Dep. 154:4–11, 174:18–21.)

Although Defendants argue otherwise and rely on the contradictory testimony of other employees, a reasonable jury could credit Plaintiff's testimony (rather than that of his co-workers) and find that Bazelais' conduct was sufficiently severe to support a disability-based hostile work environment claim.  By banning Plaintiff from use of the workplace kitchen, Bazelais stigmatized and humiliated Plaintiff because of his disability and according to Plaintiff's testimony, the conduct persisted throughout Plaintiff's employment at Unity Plaza. Based on these facts, a reasonable jury could find that Plaintiff's workplace environment was sufficiently hostile.  *See Arnold v. Rsch. Found. for State Univ. of N.Y.*, 216 F. Supp. 3d 275, 290 (E.D.N.Y 2016) ("[C]omments about the [p]laintiff's use of a handicapped bathroom, cane and freight elevator plausibly support the allegation that the [p]laintiff faced harassment that altered her employment."); *see also Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 236–37 (5th Cir. 2001) (finding disability-based harassment of HIV-positive employee was sufficiently severe to support hostile work environment claim under ADA where plaintiff's supervisors stopped socializing with her almost immediately after learning of her condition, forced her to take numerous drug tests, and gave her negative performance evaluations for first time); *cf. Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 75–76 (2d Cir. 2019) ("On [the plaintiff's] evidence at this stage, we hold, a reasonable fact finder could conclude that the . . . comments made for months by co-workers when [the plaintiff] experienced verbal tics [associated with his disability] were sufficiently severe and pervasive to change the conditions of [the plaintiff's] employment.").

The Court therefore denies Defendants' motion for summary judgement as to Plaintiff's claim that he endured a hostile worked environment at Unity Plaza based on his disability.

## 2. Garvey Plaza

Defendants argue that Plaintiff cannot establish that he suffered a hostile work environment at Garvey Plaza on the basis of his disability because: (1) "all witnesses Plaintiff deposed about this topic denied that [Chu] ever held alleged 'town hall meetings' about any staff member," (Defs.' Mem. 4); and (2) "there is no evidence that Plaintiff was denied a request for leave of absence at Marcus Garvey, or that he was ever marked absent without leave at Marcus Garvey"; and (3) "because Plaintiff never notified the NYCHA Department of Equal Opportunity about an alleged hostile work environment at Marcus Garvey, and no tangible employment action was taken against Plaintiff at Marcus Garvey, Defendants may assert the *Faragher/Ellerth* defense," (*id.* at 5).

Plaintiff argues that he was subject to a hostile work environment at Garvey Plaza on the following grounds: (1) "Chu regularly humiliated [him] by calling [his] co-workers and other office staff to gather around [his] desk while she discussed [his] upcoming medical appointments, and how [his] need to take time off for medical appointments inconvenienced everyone else," (Pl.'s Aff. ¶ 49; *see also* Pl.'s Dep. 145:22–24); and (2) Chu "denied [Plaintiff's] [l]eave of [a]bsence after publicly humiliating [him] about a private medical condition," (Pl.'s Aff. ¶ 51).

Drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could find that Chu disclosed Plaintiff's confidential medical condition in a "town hall type meeting," in addition to engaging in public discussion of his private medical condition, and could also find that these acts were sufficiently severe to create a hostile work environment. *See Alfano*, 294 F.3d at 374 ("[E]ven a single act can meet the threshold [to sustain a hostile work environment claim] if, by itself, it can and does work a transformation of the plaintiff's workplace.");

*Sanderson v. Leg Apparel LLC*, No. 19-CV-8423, 2020 WL 7342742, at *6 (S.D.N.Y. Dec. 14, 2020) ("In the right circumstances, a single comment can be severe enough to create a hostile work environment." (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000))); *see also Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016) (finding that employers' public disclosure of sensitive information regarding the plaintiff's gender transition, which "invited [the plaintiff's] coworkers to ask questions about his transition" and led to "department staff [making] inappropriate remarks about his genitalia, among other things," created a material issue of fact as to whether the defendants' conduct was sufficiently severe as to create a hostile work environment); *cf. Clark v. CSX Transp., Inc.*, No. 13-CV-1596, 2014 WL 4828154, at *4–5 (N.D.N.Y. 2014) (denying defendants' motion to dismiss plaintiff's claim that defendant "disclosed confidential information regarding his disability, in violation of the ADA" § 12112(d)(3)(B), which stipulates that an employer must treat "[i]nformation obtained regarding the medical condition or history . . . as a confidential medical record" (alteration in original)); *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) ("Individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition.").

In addition, the Court finds that Defendants have not satisfied their burden to avail themselves of the *Faragher–Ellerth* defense. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) ("It is well-established that a defendant . . . bears the burden of proving its affirmative defense."). Plaintiff testified that when he "asked [Chu] why she would humiliate [him] in front of the whole office, [by disclosing his HIV status,] she said she was scared of [him] and didn't want to have [him alone] in her office after [he] was suspended and sent to [Garvey Plaza] from Unity Plaza. (Pl.'s Dep. 235: 9–13.) While the record does not indicate that Plaintiff also put this complaint in writing or filed an EEOC Charge, "[t]here is no

requirement that a plaintiff exhaust all possible avenues made available where circumstances warrant the belief that some or all of those avenues would be ineffective or antagonistic." *See Gorzynski*, 596 F.3d at 104–05 ("Considering the courage it takes to complain about what are often humiliating events and the understandable fear of retaliation that exists in many [workplace] harassment situations, we decline to read the rule so rigidly. Accordingly, we hold that an employer is not, as a matter of law, entitled to the *Faragher/Ellerth* affirmative defense simply because an employer's [workplace] harassment policy provides that the plaintiff could have complained to other persons as well as the alleged harasser."); *see also Dash v. Bd. of Educ. of City Sch. Dist.*, 238 F. Supp. 3d 375, 394 (E.D.N.Y. 2017) ("Whether plaintiff's complaints were sufficiently reasonable in the circumstances and whether defendant exercised reasonable care to prevent the behavior complained of is a factual issue that is appropriate for a jury decision.").

Plaintiff has presented evidence from which a jury could infer that his work environment at Garvey Plaza was sufficiently hostile.[24] Therefore, the Court denies Defendants' motion for summary judgment as to Plaintiff's disability-based NYSHRL hostile work environment claim at Garvey Plaza.

### d.   Title VII, NYSHRL, and NYCHRL retaliation claims

Defendants argue that "there is no evidence that the charges against Plaintiff resulting in his termination were causally connected to Plaintiff's completion and submission of an EEOC

---

[24]   Defendants argue that "witnesses Plaintiff deposed about this topic denied that [Chu] ever held alleged 'town hall meetings' about any staff member." (Defs.' Mem. 4.) However, as discussed above, conflicting testimony is generally not enough for the moving party to prevail on a motion for summary judgment. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[A] district court may not discredit a witness's deposition testimony . . . because the assessment of a witness's credibility is a function reserved for the jury.").

questionnaire, or that but for the questionnaire, he would not have been brought up on disciplinary charges," (Defs.' Mem. 17), and also argue that Plaintiff "is precluded from relitigating the factual bases supporting the [Section 75 Trial] charges, which were sustained by the [t]rial [o]fficer," and the "[t]rial [o]fficer found that Plaintiff's misconduct and incompetence warranted his termination," (*id.* at 17). Defendants do not address the preclusive impact of the Article 78 proceeding. (*See generally id.*; *see generally* Defs.' Reply.)

Plaintiff does not address whether the Section 75 Trial or the Article 78 proceedings have preclusive effect on his claims, but argues that (1) "the charges in support of [his] [[Section 75] Trial were false, and based on retaliation for the [April] 2013 EEOC [c]harge . . . , and for being a, [g]ay, [m]an working as a Secretary [3A] in Unity Plaza's Reception Office," (Pl.'s 56.1 ¶ 16); and (2) of the nine counseling memos and instructional memorandum issued throughout his tenure at NYCHA, (*see supra* note 15), the following three were issued with retaliatory intent within the relevant time period: (a) the counseling memorandum dated January 8, 2013, issued by Traficante and witnessed by Bazelais for hiding documents, (Pl.'s Dep. 249:20–250:12); (b) the counseling memorandum dated April 19, 2013, from Traficante for providing the "wrong rent slip to the wrong person," (*id.* at 251:7–252:21); and (c) the Counseling Memorandum dated May 2, 2013, from Bazelais, (*id.* at 254:9–256:6).

Under New York law, the factual findings underlying a Section 75 trial officer's decision are given preclusive effect, such that these factual findings may not be relitigated in a subsequent federal proceeding. *See Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 49 (2d Cir. 2014) ("The *factual* findings [in a Section 75 hearing] supporting the hearing officer's ultimate conclusion — that [plaintiff] had indeed committed the charged conduct, *i.e.*, that he had failed to respond to calls and slept on duty . . . precluded [plaintiff] from arguing otherwise at trial.");

*see also Gonzalez v. City of New York*, 845 F. App'x 11, 14–15 (2d Cir. 2021) ("Factual findings made by a hearing officer in an . . . disciplinary proceeding as to the basis of a plaintiff's termination may properly preclude any dispute of fact on those findings in [subsequent federal] litigation." (citing *Matusick*, 757 F.3d 31, 49 (2d Cir. 2014))).  "Like a prior judicial finding of fact, in order to have preclusive effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication."  *Matusick*, 757 F.3d at 49 (citing Restatement (Second) of Judgments § 27 (1982)).  "But even if an identical issue was necessarily decided in the prior proceeding, issue preclusion does not apply unless there was 'a full and fair opportunity [for the party against whom preclusion is sought] to contest the decision now said to be controlling.'"  *Id.* at 45–46 (quoting *Buechel v. Bain*, 97 N.Y.2d 295, 304 (2001)).  In addition, where a plaintiff raises arguments concerning defendants' retaliatory behavior in an Article 78 proceeding, and the state court determines that defendants had a rational basis for their actions, plaintiff is precluded from raising the same claim in federal court.  *See Roth v. County of Nassau*, No. 15-CV-6358, 2018 WL 6539402, at *6 (E.D.N.Y. Mar. 27, 2018) ("Where a plaintiff has raised arguments concerning defendants' purportedly . . . discriminatory behavior in an Article 78 proceeding, and that court finds that defendants had a rational basis for their actions, a later claim that defendants' behavior was . . . discriminatory will be precluded." (quoting *McGuinn v. Smith*, No. 11-CV-4761, 2012 WL 12887595, at *7 (S.D.N.Y. Sept. 7, 2012), *rev'd on other grounds*, 523 F. App'x 764 (2d Cir. 2013)), *aff'd*, 747 F. App'x 891 (2d Cir. 2019); *see also Hughes v. Anderson*, No. 09-CV-4042, 2012 WL 3062155, at *5 (E.D.N.Y. May 31, 2012) ("To strike that claim on the principle of issue preclusion, the defendant must thus show that those identical issues were necessarily decided in the Article 78 proceeding."),

*report and recommendation adopted*, 2012 WL 3062140 (E.D.N.Y. July 26, 2012); *Yan Yam Koo v. N.Y.C. Dep't of Bldgs.*, No. 04-CV-9628, 2006 WL 963883, at *5 (S.D.N.Y. Apr. 12, 2006) (finding that "plaintiff is precluded from relitigating his discrimination and retaliation claims because [d]efendant has shown that the issues raised in [p]laintiff's federal complaint are identical to those raised in his state complaint and were addressed by the [New York State Division of Human Rights] and in the Article 78 proceedings, i.e. they were necessarily decided in the prior New York State action").

Accordingly, Plaintiff is precluded from relitigating the facts supporting the trial officer's recommendation of termination as the issues are identical, and were finally decided, after Plaintiff was afforded full and fair opportunity to contest the decision.  (*See* NYCHA R&R 173–76 (finding Defendants proved charges against Plaintiff by a preponderance of credible evidence); CSC Decision 185 (denying Plaintiff's motion for reconsideration based on ineffective assistance of counsel during CSC hearing).)  In addition, Plaintiff is precluded from relitigating claims resolved during the Article 78 proceeding — that he was denied his due process rights during the Section 75 Trial by being prevented or limited from speaking during oral argument and that the charges brought against him during the Section 75 Trial and the counseling memorandum in support of those charges were retaliatory — as the State Court's decision necessarily implies a rejection of these claims.  (*See* State Ct. Decision 192 (concluding that (1) "[NYCHA's] conduct in preventing or limiting petitioner from speaking during oral argument does not constitute a denial of due process rights, as he was represented by counsel, and [NYCHA] duly considered [Plaintiff's] post-argument submissions.  [And] [m]oreover, whether to afford a party argument is within [NYCHA's] discretion [under Civil Service Law § 76(2)], and [Plaintiff] does not substantiate any of his allegations with a transcript or other

proof"; and (2) Plaintiff "maintains that the charges against him were retaliatory," and finding

that Plaintiff's "allegation that certain adverse witnesses suborned false testimony with

NYCHA's knowledge, while serious, is unsupported and based entirely on conjecture" and that

"the allegation falls far short of demonstrating that [the CSC] acted unconstitutionally, illegally,

or in excess of its jurisdiction in affirming NYCHA's determination"); *see also Latino Officers*

*Ass'n v. City of New York*, 253 F. Supp. 2d 771, 787 (S.D.N.Y. 2003) (finding that plaintiff

"raised in his Article 78 proceeding the arguments that his termination was retaliatory and

discriminatory" and because "[t]he state court's determination . . . necessarily implied rejection

of [plaintiff's] claim that his termination was discriminatory and retaliatory. . . [a]s the Article 78

judgment . . . necessarily rests on findings that [plaintiff] was a victim neither of discrimination

nor retaliation and that there was a rational basis for the finding that the charges against him

were true, [plaintiff] is barred from relitigating the wrongful termination claims"); *McGowan v.

Schuck*, No. 12-CV-6557, 2016 WL 4611249, at *10 (W.D.N.Y. Sept. 6, 2016) ("The [c]ourt

finds . . . that even though the Article 78 court did not precisely address each of [the] issues

[raised by plaintiff in the federal proceeding], its determination that the hearing was 'fair'

functions as an actual decision on each of the issues."); *Richardson v. City of New York*, No. 97-

CV-7676, 2004 WL 325631, at *1 (S.D.N.Y. Feb. 20, 2004) ("[W]here an Article 78 petition

seeks annulment of a employment disciplinary decision on the ground that it was discriminatory

or retaliatory, a determination by the state courts that the decision was supported by substantial

evidence . . . forecloses a similar contention in a subsequent federal action." (citing *Latino

Officers Ass'n of the City of N.Y.*, 253 F. Supp. 2d at 787)).

Because the Court finds the outcomes of the Section 75 Trial and Article 78 proceedings are entitled to preclusive effect, the Court grants summary judgment to Defendants as to Plaintiff's retaliation claims.

### e. NYCHRL gender and disability discrimination claims and gender, sexual orientation, and disability-based hostile work environment claims

#### i. Claims where the Court denies Defendants' motion under Title VII and NYSHRL

As discussed above, the Court denies Defendants' motion as to: (1) Plaintiff's gender-based discrimination claim under Title VII and the NYSHRL with regard to Defendants' failure to pay overtime and assignment of a disproportionately heavy workload; (2) Plaintiff's disability discrimination claims in violation of the NYSHRL; (3) Plaintiff's gender-based hostile work environment claims in violation of Title VII and the NYSHRL; (4) Plaintiff's sexual orientation-based hostile work environment claims in violation of the NYSHRL; and (5) Plaintiff's disability-based hostile work environment claims in violation of the NYSHRL.

Because the NYCHRL is "more liberal" than its federal and state counterparts, *Makinen v. City of New York*, 857 F.3d 491, 495 (2d Cir. 2017) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)), the Court denies Defendants' motion as to these claims under the NYCHRL as well. *See Zann Kwan*, 737 F.3d at 843 n.3 ("[T]o the extent that the defendant has failed to show it is entitled to summary judgment [under Title VII], it would not be entitled to summary judgment under the more expansive standard of the NYCHRL.").

#### ii. Claims where the Court grants Defendants' motion under Title VII and NYSHRL

Because the Court denies Defendants' motion as to Plaintiff's gender discrimination claims based on (1) the assignment of non-secretarial work and (2) the issuance of counseling and instructional memorandum, the Court separately considers Plaintiff's NYCHRL claims

based on these actions.  *See Chauca v. Abraham*, 841 F.3d 86, 91 (2d Cir. 2016) ("[T]he City

Council instructed that '[t]he provisions of [the NYCHRL] shall be construed liberally . . .

regardless of whether federal or New York State civil and human rights laws, including those

laws with provisions comparably-worded to provisions of [the NYCHRL], have been so

construed." (alterations in original)); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715

F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and

independently from any federal and state law claims, construing the NYCHRL's provisions

'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably

possible.'" (citations omitted)).

Defendants argue that "[e]ven under the less stringent NYCHRL legal standards,"

Plaintiff's discrimination claim fails because "there is no evidence of gender discrimination in

any manifestation, or that Plaintiff's termination was motivated at least in part by gender

discrimination."  (Defs.' Mem. 19.)

Plaintiff argues that: (1) when Bazelais became his supervisor he "was assigned many

other duties that were not a part of [his] title," (Pl.'s Dep. 29:24–25), including copying "legal

documents from the tenant file," (*id.* at 33:17–19), "mak[ing] new tenant folders for the move-in

tenants," (*id.* at 34:6–7), "typ[ing] out leases" and other documents for the "tenant's move-in

folder," (*id.* at 40:21–41), and "call[ing] tenants and verify[ing] their phone numbers," (*id.* at

46:11–12); and (2) the counseling memorandum dated July 29, 2011, from the administrator was

motivated by gender discrimination, (*id.* at 243:25–244:5), in that Traficante falsely reported that

he witnessed "[Plaintiff] of hitting [Harvey] when [Traficante] looked right at [Harvey]

assaulting [Plaintiff]," knowing that "[b]ecause [Plaintiff] was a black man, they [could] get

away with framing [him] for being a hostile person," (*id.* at 243:25–244:5), and because Plaintiff

was "black man accused of violence against a woman," Rodriguez issued the memo without regard to the facts, (*id.* at 245:8–13).

"To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.'" *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (quoting *Mihalik*, 715 F.3d at 114); *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 329 (S.D.N.Y. 2015) (same); *see also Mihalik*, 715 F.3d at 110 ("[T]he conduct's severity and pervasiveness are relevant only to the issue of damages." (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (App. Div. 2009))). A plaintiff only needs to allege that he was treated "differently from others in a way that was more than trivial, insubstantial, or petty." *Medcalf*, 84 F. Supp. 3d at 329 n.18 (quoting *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 379 (S.D.N.Y. 2014)); *see also Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 242 (S.D.N.Y. 2017) ("[T]o establish liability under the NYCHRL, 'the plaintiff need only show differential treatment — that [he] is treated 'less well'— because of a discriminatory intent.'" (first alteration in original) (quoting *Makinen*, 167 F. Supp. 3d at 483)).

Even under this more forgiving pleading standard, however, a plaintiff must still plausibly allege that she was treated less well "at least in part '*because* of her [belonging to a protected class].'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 39, 40 n.27); *see also Bright-Asante*, 242 F. Supp. 3d at 242 ("Nevertheless, a plaintiff must still 'plead facts sufficient to support an inference that he has been treated less well at least in part *because of* a protected trait.'" (quoting *Bell v. McRoberts Protective Agency, Inc.*, No. 15-CV-0963, 2016 WL 7192083, at *5 (S.D.N.Y. Dec. 12, 2016))).

### 1.   Assignment of non-secretarial work

With respect to the assignment of non-secretarial work, because the record provides no support for Plaintiff's claim that the assigned tasks were beyond the scope of his job responsibilities for the reasons detailed above, the Court finds that summary judgment is appropriate even under the NYCHRL's more liberal standard.  *See Stratton v. Ernst & Young, LLP*, No. 15-CV-1047, 2016 WL 6310772, at *6 (S.D.N.Y. Oct. 27, 2016) ("[E]ven under NYCHRL's more liberal standard, when a plaintiff offers no evidence to rebut a defendant's non-discriminatory explanation, the claim fails." (citing *St. Jean v. United Parcel Serv. Gen. Serv. Co.*, 509 F. App'x 90, 91 (2d Cir. 2013))).

### 2.   July 29, 2011 counseling memorandum

Because the parties do not dispute that Plaintiff satisfies the first two prongs of the prima facie test (1) he belongs to a protected class, and (2) was qualified for the position in question, (*see* Defs.' Opp'n 14), the Court considers whether in receiving the counseling memorandum dated July 29, 2011, Plaintiff (1) suffered an adverse employment action, and (2) whether the adverse action occurred under circumstances that give rise to an inference of gender discrimination.  *See Montgomery v. N.Y.C. Trans. Auth.*, No. 17-CV-6522, 2019 WL 1258482, *3 (S.D.N.Y. Mar. 19, 2019) ("The same four prongs [of the Title VII prima facie case] apply to claims under the NYCHRL, except that a plaintiff need not show that she suffered a materially adverse employment action; to establish a prima facie case, [he] need only demonstrate differential treatment that is 'more than trivial, insubstantial, or petty.'" (quoting *Jeune v. City of New York*, No. 11-CV-7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014))).

### A.   Adverse action

Unlike the NYSHRL or Title VII, plaintiff is not required to show that an employment action was materially adverse in order to satisfy the third prong of the prima facie case under the NYCHRL.  *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012) (citing *Williams*, 872 N.Y.S.2d at 34); *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011) ("A number of courts have now held that adverse employment actions need not be material in order to violate the NYCHRL and that any non-trivial discriminatory act is actionable."); *see also Kellman*, 8 F. Supp. 3d at 384 ("In order 'to make out the [adverse action] prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty.'" (quoting *Williams*, 836 F. Supp. 2d at 173)).

The Court finds that Plaintiff satisfies the third element of the prima facie case, because although the counseling memorandum did not impact the terms and conditions of his employment it was not "merely trivial" under the NYCHRL.  *See Sotomayor*, 862 F. Supp. 2d at 258 (holding that while negative evaluations "do not rise to the level of a materially adverse employment action, they are more than merely 'trivial, insubstantial, or petty'" under the NYCHRL).

### B.   Inference of discrimination

Under the NYCHRL, "the fourth prong of a prima facie case is established so long as 'a member of a protected class was treated differently than a worker who was not a member of that protected class.'"  *Maynard v. Montefiore Med. Ctr.*, No. 18-CV-8877, 2021 WL 396700, at *6 & n.8 (S.D.N.Y. Feb. 4, 2021) (quoting *Leon v. Columbia Univ. Med. Ctr.*, No. 11-CV-8559, 2013 WL 6669415, at *11 (S.D.N.Y. Dec. 17, 2013) ("[T]o defeat summary judgment, Plaintiff

'need only show differential treatment — that she [wa]s treated "less well" — because of a discriminatory intent." (quoting *Mihalik*, 715 F.3d at 110)).

Plaintiff testified that Traficante saw Harvey "assaulting" Plaintiff, (Pl.'s Dep. 244:1–2), as he "was sitting down" and "Harvey was standing over [him] yelling and spitting on [him]," (*id.* at 244:14–16), but Traficante nevertheless lied and told Rodriguez that Plaintiff was responsible for creating a hostile work environment, knowing that "because [Plaintiff] is a black man, [Traficante could] get away with framing [him] for being a hostile person," (*id.* at 244:4–5). In addition, Plaintiff testified that Rodriguez issued the counseling memo because "he didn't care about the facts" as Plaintiff "was a black man accused of violence against a woman." (*Id.* at 245:10–13.)

The Court, therefore, finds that Plaintiff satisfies the fourth element of the prima facie case, as the record provides support for his claim that the circumstances under which the counseling memorandum was issued gives rise to an inference of discrimination because Plaintiff testified that Traficante witnessed Harvey engaging in similar, if not more severe, conduct, but unlike Plaintiff, she was not disciplined for her behavior. *See Kellman*, 8 F. Supp. 3d at 380 ("Under the NYCHRL, 'the inference of discrimination prong of the prima facie case is satisfied if a member of a protected class was treated differently than a worker who was not a member of that protected class.'" (quoting *Leon*, 2013 WL 6669415, at *11)); *see also Villar v. City of New York*, 135 F. Supp. 3d 105, 123, 130 (S.D.N.Y. 2015) (denying defendant's summary judgment motion as to NYCHRL sex discrimination claim, in part based on evidence in the record that a similarly situated male employee "engaged in conduct comparable to [p]laintiff's but received a far less harsh penalty" who was disciplined less severely for similar conduct).

As Defendants offer no legitimate, non-discriminatory reason for the issuance of the counseling memorandum dated July 29, 2011, the Court denies Defendants' motion for summary judgment as to this claim.[25]   *See Mealey v. Apartment Rentals*, 125 F.3d 844, 844 (2d Cir. 1997) (quoting *Frazier v. Rominger*, 27 F.3d 828, 834 (2d Cir. 1994)).

## III.   Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.  The Court denies Defendants' motion as to: (1) Plaintiff's gender-based discrimination claim under Title VII, the NYSHRL, and the NYCHRL with regard to Defendants' failure to pay overtime and assignment of a disproportionately heavy workload; (2) Plaintiff's disability-based discrimination claims in violation of the NYSHRL and the NYCHRL; (3) Plaintiff's gender-based hostile work environment claims in violation of Title VII, the NYSHRL, and the NYCHRL; (4) Plaintiff's sexual orientation-based hostile work environment claims in violation of the NYSHRL and the NYCHRL; (5) Plaintiff's disability-

---

[25]  Neither party addresses the timeliness of Plaintiff's claim regarding the July 29, 2011 counseling memorandum under the NYCHRL.  Under the NYCHRL, the statute of limitations is three years.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).  However, under the NYCHRL's continuing violations doctrine "[o]therwise time-barred discrete acts . . . are timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'"  *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).  As discussed above, because a reasonable jury could find that Plaintiff suffered gender discrimination on numerous occasions within the statutory period, the issuance of the counseling memorandum dated July 29, 2011, may be fairly construed as part of a pattern of discrimination based on Plaintiff's gender.  *See Morgan v. N.Y. State Att'y Gen.'s Off.*, No. 11-CV-9389, 2013 WL491525, at *12 (S.D.N.Y. Feb. 8, 2013) (continuing violation found under the NYCHRL where untimely failure to promote claim and timely hostile work environment claim were both premised on same national origin discrimination); *Akhtar v. Saudia*, No. 19-CV-3763, 2021 WL 1758807, at *10 (S.D.N.Y. May 4, 2021) (finding that although "Plaintiff's allegations of discriminatory acts occurring . . . three years before . . . her NYCHRL statute of limitations period began to run," plaintiff's claims "are timely under the continuing violations doctrine to the extent that they are a continuation of related incidents of discriminatory practice that continued to occur" within the statutory period).

based hostile work environment claims in violation of the NYSHRL and the NYCHRL; and

(6) Plaintiff's gender-based discrimination claim under the NYCHRL with regard to the

counseling memorandum dated July 29, 2011.  The Court grants Defendants' motion as to:

(1) Plaintiff's gender discrimination claim under the Title VII and the NYSHRL based on the

assignment of non-secretarial work, the issuance of counseling and instructional memoranda and

his termination; (2) Plaintiff's gender discrimination claim under the NYCHRL based on the

assignment of non-secretarial work and his termination; and (3) Plaintiff's retaliation claims

under Title VII, the NYSHRL and the NYCHRL.

Dated:  September 30, 2021
        Brooklyn, New York

                             SO ORDERED:


                               s/ MKB
                             MARGO K. BRODIE
                             United States District Judge